Robson BONNICHSEN; C. Loring Brace; George W. Gill; C. Vance Haynes, Jr.; Richard L. Jantz; Douglas W. Owsley; Dennis J. Stanford; and D. Gentry Steele, Plaintiffs,

v.

UNITED STATES of America; Department of the Army; U.S. Army Corps of Engineers; U.S. Department of the Interior; National Park Service; Francis P. McManamon; Ernest J. Harrell; William E. Bulen, Jr.; Donald R. Curtis; Lee Turner; Louis Caldera; Bruce Babbitt; Donald J. Barry; Carl A. Strock; and Joe N. Ballard, Defendants.

Civil No. 96–1481–JE.

United States District Court, D. Oregon.

Aug. 30, 2002.

---

Alan L. Schneider, Paula A. Barran, Barran Liebman LLP, Portland, OR, for Plaintiffs.

David F. Shuey, U.S. Department of Justice, Environment & Natural Resources Division, General Litigation Section, Washington, DC, Timothy W. Simmons, Assistant U.S. Attorney, Portland, OR, for Defendants.

## OPINION AND ORDER

JELDERKS, United States Magistrate Judge.

Plaintiffs bring this action seeking judicial review of a final agency decision that awarded the remains of the "Kennewick Man" to a coalition of Indian tribes and denied the Plaintiffs' request to study those remains. Plaintiffs assert other claims based upon alleged statutory violations.

Plaintiffs seek to vacate the administrative decision which was made after an earlier decision was remanded to the agency for further proceedings. For the reasons set out below, I set aside the decision awarding the remains to the Tribal Claimants, enjoin transfer of the remains to the Tribal Claimants, and require that Plaintiffs be allowed to study the remains. Plaintiffs' request for other relief is granted in part and denied in part.

## PARTIES

The Plaintiff scientists are highly regarded experts in their fields. Plaintiff Bonnichsen is Director of the Center for the Study of the First Americans at Oregon State University. Plaintiff Brace is Curator of Biological Anthropology at the University of Michigan Museum of Anthropology. Plaintiffs Gill, Haynes, Jantz, and Steele are anthropology professors. Plaintiff Owsley is division head for physical anthropology at the Smithsonian Institution's National Museum of Natural History. Plaintiff Stanford is Director of the Smithsonian's Paleo Indian Program.

The Defendants are the Army Corps of Engineers, the United States Department

of the Interior, the Secretary of the Interior, and other federal officials. *Amici curiae* have also participated.[1]

## I. BACKGROUND

### A. Pre–Litigation Events

In July 1996, a human skull and scattered bones were discovered in shallow water along the Columbia River near Kennewick, Washington.[2] The remains were found on federal property under the management of the United States Army Corps of Engineers (Corps), and were removed pursuant to an Archeological Resources Protection Act (ARPA) permit dated July 30, 1996.[3] Local anthropologists who examined the find at the request of the county coroner initially believed the remains were of an early European settler or trapper, based upon physical features such as the shape of the skull and facial bones, and certain objects which were found nearby.[4]

However, the anthropologists then observed a stone projectile point (aka "lithic object") embedded in the ilium (*i.e.*, upper hip bone). The object's design, when viewed with x-rays and CT scans of the hip, resembled a style that was common before the documented arrival of Europeans in this region. Further examination of the remains revealed characteristics inconsistent with those of a European settler, yet also inconsistent with any American Indian[5] remains previously documented in the region.

To resolve this ambiguity, a minute quantity of metacarpal bone was radiocarbon dated. The laboratory initially estimated that the sample was between 9265 and 9535 calendar years old, COE 8715, but later adjusted that estimate to between 8340 and 9200 calendar years old after factoring in several corrections. COE 4030, DOI 10023.[6]

Human skeletons this old are extremely rare in the Western Hemisphere, and most

---

1. *Amici curiae* include four of the Tribal Claimants (the Yakama, Umatilla, Colville, and Nez Perce of Idaho), the National Congress of American Indians, and the Society for American Archaeology ("SAA").

2. A summary of some early events in this case, prepared by the Corps of Engineers, is at DOI 2759–64. The administrative record in this case includes more than 22,000 pages. Cites to "DOI nnnn" refer to the record compiled by the U.S. Department of Interior ("DOI"). "COE nnnn" refers to the record compiled by the U.S. Army Corps of Engineers ("Corps"). "SUP nnn" is the supplemental record compiled by the Corps, and "FOIA nnn" is the record compiled by the Corps concerning Freedom of Information Act ("FOIA") requests. "ER nnn" is the supplemental excerpts of record filed by Plaintiffs.

3. In a letter to Plaintiffs' counsel dated January 24, 1997, Corps District Engineer Lt. Colonel Donald Curtis, Jr. acknowledged that the remains were subject to ARPA. Plaintiffs cite ARPA as the "principal controlling stat-

ute" relevant to this case. Memorandum in Support of Motion for Order Granting Access to Study at 17.

4. Experts have since determined that these objects are unrelated to the human remains.

5. This Opinion uses the terms "American Indian" because the definition of "Native American," as used in a particular statute, is a disputed issue in this case.

6. It is important to distinguish between radiocarbon ages and dates expressed in calendar years. The radiocarbon age obtained from the metacarpal bone tested in 1996 was 8410 +/–60 B.P. (before present). *Id.* By convention, "present" is fixed at 1950 A.D. COE 5024. To arrive at a date in calendar years, a radiocarbon age must be corrected to compensate for various factors. The administrative record contains numerous texts and affidavits explaining the theory, procedures, and potential pitfalls of radiocarbon dating. *See, e.g.,* DOI 399–410, 614–620, 4294, 4302, 4348–61, 4412–4478, 4746–83, 5584–5591.

found to date have consisted of very fragmented remains. Here, by contrast, almost 90% of this man's bones were recovered in relatively good condition, making "Kennewick Man"—as he was dubbed by the news media—"one of the most complete early Holocene [7] human skeletons ever recovered in the Western Hemisphere." R.E. Taylor, *Amino Acid Composition and Stable Carbon Isotope Values on Kennewick Skeleton Bone.*

The discovery also attracted attention because some physical features, such as the shape of the face and skull, appeared to differ from modern American Indians. Many scientists believed the discovery could shed considerable light on questions such as the origins of humanity in the Americas. According to Plaintiff Dr. Douglas Owsley of the Smithsonian Institution, "[w]ell-preserved Paleo American remains are extremely rare. The Kennewick Man skeleton represents an irreplaceable source of information about early New World populations, and as much data should be obtained from it as possible." DOI 1585. Arrangements were made to transport the remains to the Smithsonian Institution for scientific study by a team including Plaintiffs Owsley, Jantz and Stanford. COE 7905, 9461–62.

Local Indian tribes opposed scientific study of the remains on religious grounds:

> When a body goes into the ground, it is meant to stay there until the end of time. When remains are disturbed and remain above the ground, their spirits are at unrest.... To put these spirits at ease, the remains must be returned to the ground as soon as possible.

Joint Tribal *Amici* Memorandum (1997) at 4–5.

In response to arguments that scientific study could provide new information about the early history of people in the Americas, the Confederated Tribes of the Umatilla asserted, "We already know our history. It is passed on to us through our elders and through our religious practices." DOI 1376. "From our oral histories, we know that our people have been part of this land since the beginning of time. We do not believe that our people migrated here from another continent, as the scientists do." *Id.*

Five Indian groups (hereafter, the "Tribal Claimants") [8] demanded that the remains be turned over to them for immediate burial at a secret location "with as little publicity as possible," and "without further testing of any kind." DOI 1256–57, 1373–76, 1380. The Tribal Claimants based their demand on the Native American Graves Protection and Repatriation Act, 25 USC § 3001 *et seq.* ("NAGPRA"), enacted in 1990.

Citing NAGPRA, the Corps seized the remains shortly before they could be transported to the Smithsonian for study. The Corps also ordered an immediate halt to DNA testing, which was being done using the remainder of the bone sample that had been submitted for the radiocarbon dating earlier. After minimal investigation, the Corps decided to give the remains to the Tribal Claimants for burial.

---

7. "Holocene" refers to the most recent geological epoch, which began about 10,000 years ago. *Oxford English Dictionary*, 1989.

8. The Tribal Claimants are the Confederated Tribes & Bands of the Yakama Indian Nation ("Yakama"), the Nez Perce Tribe of Idaho ("Nez Perce"), the Confederated Tribes of the Umatilla Indian Reservation ("Umatilla"), the

Confederated Tribes of the Colville Reservation ("Colville"), and the Wanapam Band ("Wanapam"), which is not a federally recognized tribe. "Yakama" is sometimes spelled "Yakima." The former spelling, used by the Yakama Indian Nation, will be used in this Opinion except when the latter spelling appears in quoted material.

As required by NAGPRA, the Corps published a "Notice of Intent to Repatriate Human Remains" in a local newspaper.[9]

Plaintiffs and others, including the Smithsonian Institution, objected to the Corps' decision, asserting that the remains were a rare discovery of national and international significance. They questioned whether NAGPRA was applicable because certain skeletal traits did not resemble those of modern American Indians, and argued that the Tribal Claimants did not meet the statutory requirements to claim the remains. In late September 1996, several of the Plaintiffs asked Major General Ernest J. Herrell, Commander of the Corps' North Pacific Division, to allow qualified scientists to study the remains.

When the Corps failed to respond to these objections and requests, and evidenced its intent to repatriate the remains, Plaintiffs commenced this litigation.[10] Plaintiffs have consistently sought two primary objectives: to prevent the transfer of the remains to the Tribal Claimants for burial, and to secure permission for Plaintiffs to study the remains.

It is undisputed that if the Tribal Claimants gain custody of the remains, they will prohibit all further scientific study and documentation of the remains, whether by Plaintiffs or by other scientists. *See, e.g.,* DOI 3362, 3386.

## B. First Phase of The Litigation

On October 23, 1996, this court held a hearing on Plaintiffs' request for a temporary restraining order. In lieu of a formal injunction, Defendants agreed to give Plaintiffs at least 14 days notice before any disposition of the remains to allow Plaintiffs time to seek relief from this court. Defendants later moved to dismiss this lawsuit. In an Opinion issued February 19, 1997, I denied the motion. *Bonnichsen v. United States,* 969 F.Supp. 614 (D.Or. 1997).

Defendants then moved to dismiss this lawsuit on the grounds that Plaintiffs lacked standing to maintain this action, that the claims were not ripe because the Corps had not made a final decision, and that the claims were moot because the Corps' earlier decision was no longer in effect. In an Opinion issued on June 27, 1997, I rejected each of those contentions. *Bonnichsen v. United States,* 969 F.Supp. 628 (D.Or.1997). In addition, I found "that the agency's decision-making procedure was flawed" and its decision "premature," that the Corps "clearly failed to consider all of the relevant factors or all aspects of the problem," "did not fully consider or resolve certain difficult legal questions," "assumed facts that proved to be erroneous," and "failed to articulate a satisfactory explanation for its actions." *Id.* at 645. I also questioned whether "the Corps has entirely abandoned its earlier decision and

---

**9.** The Notice stated, in relevant part, that (1) it was issued pursuant to NAGPRA, (2) the Corps had determined the remains were of Native American ancestry, (3) the remains were inadvertently discovered on federal land recognized as aboriginal land of an Indian tribe, (4) a relationship of shared group identity can be reasonably traced between the human remains and five Columbia River basin tribes and bands, (5) the Corps intended to repatriate the remains to those tribes, (6) notice had been given to certain Indian tribes, (7) representatives of any other Native American Tribe that believed itself to be culturally affiliated with these human remains should contact the Corps of Engineers before October 23, 1996, and (8) repatriation might begin after that date if no additional claimants came forward.

**10.** A second lawsuit was filed by members of the Asatru Folk Assembly, which was described in the complaint as a legally-recognized church "that represents Asatru, one of the major indigenous, pre-Christian, European religions." The Asatru action has since been abandoned.

is now objectively considering the evidence and the law without any preconceived notions concerning the outcome." *Id.* at 641.

I vacated the Corps' earlier decision regarding disposition of the remains, and remanded the issues to the Corps for further proceedings. The Corps was directed "to fully reopen this matter, to gather additional evidence, to take a fresh look at the legal issues involved," and to reach a decision that was based upon all of the evidence. *Id.* at 645. Relevant legal standards were to be applied and the Corps was to provide a clear statement of the reasons for its decision. *Id.* In addition, I provided the Corps with a non-exclusive list of issues to consider on remand, and ordered Defendants to continue storing the remains "in a manner that preserves their potential scientific value" pending a final determination of the Plaintiffs' claims. *Id.* at 646, 648, 651–54.

In the same decision, I denied, without prejudice, Plaintiffs' motion to study the remains, and directed the Corps to consider, on remand, "whether to grant Plaintiffs' request for permission to study the remains." [11] *Id.* at 632, 651.

### C. Events Following Remand
#### 1. Curation

Storage of the remains in a manner that preserves their potential scientific value has been a topic of considerable concern.

In September 1996, the femurs apparently disappeared. It was 18 months before the Corps discovered that the femurs were missing, and almost five years before they were recovered.[12]

Only weeks after the Corps disclosed that the femurs were missing, a box with a small quantity of bones believed to be from the Kennewick skeleton was taken by Tribal representatives from the Corps' "secure" storage facility and secretly buried, under circumstances the Corps has never satisfactorily explained.[13]

The remaining bones were initially stacked on top of each other in a plywood box—the cover held in place with strips of duct tape—with inadequate padding, environmental controls, or other precautions necessary to fully preserve their potential scientific value. COE 2470–79, 2506–07, 2521, 5332–49, DOI 1867–01889. A few bones were stored in a paper sack. COE 5334.[14]

The Corps allowed Tribal representatives to visit the remains to conduct religious ceremonies without notifying the court or opposing parties, and allowed the remains to be handled and stored in a manner that failed to protect them from possible contamination by modern DNA. This potentially jeopardized, and certainly complicated, subsequent efforts to identify the ancestry of the Kennewick Man through DNA analysis.[15] During

---

**11.** Plaintiffs' motion cited several statutes, but relied primarily on ARPA, 16 USC § 470 aa *et seq.*

**12.** The missing femurs apparently spent those years in a box in the county coroner's evidence locker. Despite some early suggestions of criminal activity, the misplacement of the femurs now appears to have been an innocent oversight.

**13.** The box which was taken contained one or more items that were probably from the Kennewick skeleton but were being stored separately with some unrelated items. DOI

2840–42, 4921, COE 3863, 5608, 5651, 5397–99, 5832, *but cf.*, DOI 3667–68.

**14.** It is unclear whether curation played a role, but the bone sample tested in 1996 proved to be far better preserved—and more suitable for DNA and radiocarbon testing—than the bone samples tested in 1999 and 2000. DOI 5795, 5811, 5837, 5843.

**15.** *See, e.g.,* DOI 9442–43, 9581 (presence of even small amounts of modern DNA from sources such as shed skin cells and aerosolized saliva can easily overwhelm a small quantum of ancient DNA), DOI 02750–51 (to

ceremonies, the Corps allowed Tribal representatives to place plant materials in the container with the remains, and to burn additional plant material (reportedly cedar or sage) on, or close to, the remains. DOI 2907, COE 2471, 5334, 7931. After it became apparent that the Corps lacked the expertise, facilities, and perhaps the commitment to properly curate the remains, the court ordered that the remains be transferred to a climate-controlled secure storage room at the Burke Museum in Seattle.

## 2. Limited Study of the Discovery Site

In December 1997, a team composed of representatives from the Tribal Claimants, the Corps and other federal agencies, and a team from Washington State University led by Dr. Gary Huckleberry,[16] performed a very limited investigation of the site where the remains had been found. COE 4895-A [17] to 5036, 5815-64. The study focused on determining whether the sediment record was consistent with the radiocarbon date obtained, and whether the remains were buried intentionally or by natural causes such as a flood. Neither question was conclusively resolved, but initial indications were that the sediment record was generally consistent with the radiocarbon date.

The scope of the 1997 study was severely restricted because the Tribal Claimants strongly opposed any study of the site.

COE 4509, 4547-48, 4553-54, 4562-63, 4924, 5672-73, 5838-40, 5925-26, 6713-14, 6718a-b. According to Dr. Huckleberry, less than 0.0001% of the easily-testable sediment volume was examined. SUP 7.

Dr. Huckleberry, among others, has strongly recommended additional investigatio n of the site to confirm the accuracy of the radiocarbon date, to ascertain whether the remains may have been contaminated with "old" or "new" carbon (which could distort the radiocarbon results), and to ascertain whether any artifacts were present that might furnish clues to the cultural affiliation of the Kennewick Man. COE 4273-95, 4872-74 B, 5837-38, SUP 2-24. *See also,* COE 4998 (initial test of ground-penetrating radar "shows great promise" for detecting any cultural artifacts that might be present at the site).[18] However, the Corps has refused to authorize any further study of the site, and has taken affirmative steps to prevent any future study.

## 3. Burial of the Discovery Site

In April 1998, the Corps buried the discovery site of the remains under approximately two million pounds of rubble and dirt, topped with 3700 willow, dogwood, and cottonwood plantings. COE 5873-74, DOI 2347-51, 2515. The lengthy administrative record that Defendants filed with this court documents only a portion of the process by which the decision to bury the

---

ensure accurate DNA testing, it is essential that the bone not be touched with an ungloved hand); DOI 05603 ("Identification of contamination has emerged as the single most critical issue in ancient DNA extraction"); DOI 6773, 6788-91. *But cf.,* DOI 10002 (improvements in technique make contamination a lesser issue today than in the past).

16. Dr. Chatters, who originally collected the remains, was also a member of that team. Plaintiff Bonnichsen was present for part of the investigation.

17. In assembling the administrative record, the Corps reused a block of numbers; after

page 4899, the pagination reverts to 4801. The citation to page "4895-A" refers to the first document numbered page 4895, while page "4895-B" is the second document assigned that number.

18. There is also evidence that a Corps expert recommended further study of the site, but, *after protests from the Tribal Claimants, the* expert was ordered to remove this language from the final report. SUP 489. See also, SUP 552 (instructing a Corps employee to alter recommendation for further study).

site was made. Nevertheless, that record strongly suggests that the Corps' primary objective in covering the site was to prevent additional remains or artifacts from being discovered, not to "preserve" the site's archaeological value or to remedy a severe erosion control problem as Defendants have represented to this court.

The proposal to bury the site originated in September 1996, COE 4542, SUP 930–36, not in the Fall of 1997 as the Corps has represented. The Corps told the Tribal Claimants it shared their concern "that continuing erosion may result in more exposures" and that it would proceed with plans to shore up the site "as soon as possible." SUP 934–36. The Tribal Claimants expressed dissatisfaction with the Corps' original proposal for a temporary "soft" erosion control project, warning that other human remains could be uncovered or that pothunters might loot the site in search of artifacts. SUP 907–11, 913, COE 4542, 5678–79, 5766.

The project to cover the site was initially deferred while this litigation proceeded, but was revived in 1997 after this court vacated the Corps' original decision to turn over the remains to the Tribal Claimants. The Tribal Claimants demanded, and the Corps eventually agreed, that the site be "armored" to provide "permanent protection" against disturbances. SUP 886–93, 907–11, 913, COE 4542, 5678–79, 5766, 5798.

On or about November 6, 1997, the "White House" ordered Lt. Colonel Donald Curtis, Jr., Corps District Engineer, to proceed with the armoring project. SUP 323, 821.[19] The project was to be completed by January 1, 1998, and the Corps was given a budget of $200,000 to accomplish the task. SUP 821, COE 5873.[20]

The Corps consulted extensively with the Tribal Claimants, but told Plaintiffs nothing about plans to bury the site. The Plaintiffs heard rumors about this project, and beginning in November 1996, repeatedly asked Defendants about it. (*See, e.g.*, COE 5900–02 (letter dated July 29, 1997), 5903 (Dec. 12, 1996), and 5904 (letter of Nov. 6, 1996)). Defendants withheld all information regarding the project from Plaintiffs until December 26, 1997, COE 5732, *after* the final decision had been made.

When the Corps' intentions became known, legislation was introduced to prohibit the Corps from undertaking the project without approval from this court. COE 6004, 6316–20, 6341. This legislation passed both houses of Congress, and awaited only a conference committee to resolve differences in unrelated provisions of the bills. SUP 329–31. The Corps initially told the local congressional delegation that it would comply with the legislation, but in a decision made at the highest levels of the Corps, the agency reversed its course within 24 hours. COE 4535, 4654–57, SUP 279–80, 291, 320–23, 332, 334–36. Taking advantage of a brief congressional recess, the Corps announced it would proceed with the project unless enjoined. COE 5762–63, 5771a, 5772–76, 5791, SUP 273–74, 286–87, 345, 359, 381.[21]

---

**19.** Although Defendants argued that the numerous references in the record to White House involvement concerned only a low-level visiting scientist monitoring the Kennewick controversy for his own curiosity, it is difficult to believe that an Army Colonel would follow orders from a low-level visiting scientist on an issue of this magnitude.

**20.** Some documents do refer to the archaeological sensitivity of the site, but this appears to be a euphemism for the Tribal Claimants' concern that additional remains might be uncovered.

**21.** Though the Corps argues that it had to complete the project before April 15, 1998, due to salmon-related restrictions, there is no evidence that the deadline was inflexible. At oral argument, Defendants also argued that the Corps was rushing to complete the project before the funding appropriation expired, but

When Plaintiffs did not immediately move for injunctive relief, the Corps proceeded with the project despite an "almost ... steady stream of calls" from outraged citizens and from some members of Congress as well. SUP 273–74. The Commander of the Corps, General Joe Ballard, predicted that "the din will die out very quickly." SUP 273–74.

Burial of the discovery site hindered efforts to verify the age of the Kennewick Man remains, and effectively ended efforts to determine whether other artifacts are present at the site which might shed light on the relationship between the remains and contemporary American Indians. DOI 2648–49, 4019–42, COE 5138. *See also,* SUP 950–53 (discussion of harm that can result from burial of an archaeological site). Although the Corps has represented that it buried the site to preserve its archaeological value for future study, the Corps has denied all requests to study the site. COE 4084, 4160, 4163, 4167–80, 4300–01, 5139, 5254, 5550, 5664, 5833, SUP 001–26.

### 4. Interagency Agreement with the Department of Interior

On March 24, 1998, the Corps and the Department of Interior (DOI) entered into an Interagency Agreement that effectively assigned the DOI responsibility for deciding whether the remains are "Native American" under NAGPRA, and for determining their proper disposition. DOI 2676–78. Thereafter, the DOI assumed the role of lead agency on most issues concerning this case.[22]

### 5. The Agency's Examination of the Remains

Almost two years after this matter was remanded for reconsideration, Defendants began to examine the remains in detail. The Secretary's experts first attempted to ascertain, through non-destructive[23] examination of the remains, approximately when the Kennewick Man had lived, his ancestry, and whether he could be linked to a modern tribe or people. Those experts estimate that he was 5′ 9″ to 5′ 10″ tall, was 45 to 50 years of age when he died, DOI 10677, and was 15 to 20 years old when the projectile point became embedded in his hip, DOI 10681. Red stains were found on several bones, which Defendants initially attributed to ochre that was sometimes used in mortuary rituals. It was later determined that the stains "are unlikely to be of cultural origin" and appeared to be the result of natural postmortem processes. DOI 9766.

The condition of the remains strongly suggests that the body was not left exposed on the surface after death, but Defendants' experts were unable to determine whether the body was buried intentionally or by a catastrophic event such as a flood. DOI 9765, 10664. One group of experts thought intentional burial was the most probable scenario, but ultimately concluded that "given the currently available evidence, the issue of whether or not this individual was intentionally buried remains unresolved." DOI 9765. A second group of experts, who conducted limited studies on the site before it was covered, concluded that the

---

there is nothing in the record to substantiate that contention. Rather, it appears that the Corps was hurrying to complete the project before final passage of the legislation that would have prohibited it.

**22.** Hereafter, "Secretary" refers to the Secretary of the Department of Interior.

**23.** The Tribal Claimants prefer the term "non-destructive" rather than "non-invasive" because they consider handling, viewing, or photographing remains to be invasive.

skeleton most likely was buried by natural processes. DOI 2647, 02651. The Corps' decision to bury the site has prevented further examination of this issue.

Defendants' experts were unable to determine, from non-destructive examination alone, when the Kennewick Man lived. However, analysis of sediment layers where he was found supports the hypothesis that he was buried not less than 7600 years ago, and could have been buried more than 9000 years ago (the date indicated by the initial radiocarbon dating). DOI 2647, 10053. Further study of the sediments was strongly recommended, DOI 2647–51, but Defendants' decision to bury the site prevented completion of those studies.

The experts compared the physical characteristics of the remains—*e.g.*, measurements of the skull, teeth, and bones—with corresponding measurements from other skeletons. They concluded that the Kennewick remains are unlike *any* known present-day population, American Indian or otherwise.[24] DOI 10665, 10685–92.

> Like other early American skeletons, the Kennewick remains exhibit a number of morphological features that are not found in modern populations. For all craniometric dimensions, the probabilities of membership in modern populations were zero, indicating that Kennewick is unlike any of the reference samples used. Even when the least-conservative inter-individual distances are used to construct typicality probabilities, Kennewick has a low probability of membership in any of the late Holocene reference samples....

> [These results] are not surprising considering that Kennewick is separated by roughly 8,000 years from most of the reference samples [in the database.]

DOI 10691.

> The most craniometrically similar samples appeared to be those from the south Pacific and Polynesia as well as the Ainu of Japan, a pattern observed in other studies of early American crania from North and South America.... Only the odontometric data suggested a connection between Kennewick and modern American Indians, but the typical probabilities for this analysis were all very low. Clearly the Kennewick individual is unique relative to recent American Indians, and finds its closest association with groups of Polynesia and the Ainu of Japan.

*Id.*

Although the "strongest morphological affinities for the Kennewick remains are with contemporary or historic 'populations in Polynesia and southern Asia, and not with American Indians or with Europeans in the reference samples' ... even the 'strongest' morphological affinities with modern human populations" are "not particularly robust." DOI 10067–68. "The Kennewick individual can be excluded, on the basis of dental and cranial morphology," not just "from recent American Indians" but "from *all* late Holocene human groups." DOI 10692 (emphasis in original).

Defendants' experts cautioned, however, that an apparent lack of physical resemblance between the Kennewick Man and present-day Indian people "does not com-

---

**24.** These experts did *not* conclude that the Kennewick individual was "Caucasian." Although terms such as "white male" and "caucasian-like" appear in his notes of preliminary impressions when the remains were first discovered, DOI 1227–32, Dr. Chatters then observed some anomalies, such as the projec-

tile point and tooth wear, that led him to recommend radiocarbon dating. After reviewing this additional information, Dr. Chatters revised his assessment. DOI 8186, 8196 ("I did not state, nor did I intend to imply, once the skeleton's age became known, that he was a member of some European group").

pletely rule out the possibility that these ancient remains might be biologically ancestral to modern American Indian populations." DOI 10684. Moreover, although the Kennewick Man's morphological traits do not closely resemble those of modern American Indian populations, Defendants' experts note that the Kennewick Man's traits are generally consistent with the very small number of human remains from this period that have been found in North America. DOI 10067–68, 10691. They also note potential similarities to certain Archaic populations (between 2,000 and 8,000 years old) from the northern Great Basin and eastern woodlands of North America. DOI 10068, 10688, 10692.

Because they concluded that the non-destructive examination did not furnish a definitive answer to the question whether the Kennewick Man is "Native American" for purposes of NAGPRA, Defendants sent several small bone samples to selected laboratories for additional radiocarbon dating. Whether due to differences in how long a particular bone had been exposed to the elements, technique in selecting the samples, deterioration while in storage, or some other reason, the samples tested in 1999 were in much poorer condition than the sample tested in 1996, and there were considerable variations in the results. DOI 5809–48. The best preserved sample

yielded a radiocarbon age of 8410 +/40 BP, virtually identical to the results of the 1996 testing. DOI 10020. After adjustments, the age of that sample was estimated at between 9370 and 9560 calendar years, although that date might be "several hundred years" too old if the Kennewick Man had a mostly marine diet. DOI 10027–29.[25]

The 1996 and 1999 tests, coupled with an analysis of sediments and the lithic object embedded in the ilium, established to the Secretary's satisfaction that the remains are probably between 8500 and 9500 years old. DOI 10015, 10018–22.

Relying simply on the age of the remains, and the fact that they were found inside the United States, Defendants formally pronounced the remains "Native American." DOI 10018–22. In an effort[26] to determine whether DNA could establish a link between the remains and any particular Tribal Claimant, and to answer other questions regarding the ancestry of the remains, Defendants authorized DNA testing. The selected laboratories were unable to isolate uncontaminated DNA within the allotted time, though it is not clear why the testing failed. It is also unclear whether, given more time, different samples, or technological advances, it would be possible to isolate uncontaminated DNA from the Kennewick remains.[27]

---

**25.** Another laboratory tested a sample from the same bone, and obtained a radiocarbon age of 8130 +/–40 BP, a difference of about 300 years. DOI 10020. Samples from several other bones were tested, but they were poorly preserved and the laboratories expressed little confidence in the results. One yielded a radiocarbon date of 5570 +/–100 BP (or about 6360 to 6800 calendar years) DOI 10042, while another yielded a radiocarbon date of 6940 +/–30 BP. DOI 10020, 10040.

**26.** Before deciding to proceed with the DNA analysis, Defendants commissioned a study which concluded that, for a variety of reasons, it was unlikely that uncontaminated

DNA suitable for testing would be isolated from these remains given the limits of current technology. DOI 6770–6806.

**27.** *Cf.,* DOI 9860–61 ("the lack of success in amplifying ancient DNA from one sample has little bearing on the probability of success in the analysis of another"); DOI 9732, 10560 (failure to extract DNA from this one sample "should not preclude further DNA testing using future novel methods on other, perhaps more DNA-rich, bone samples from the Kennewick remains"); DOI 8555 (Defendants "are making a huge mistake by not [testing] a tooth" from the Kennewick remains in addition to any other bone samples); DOI 10001

### 6. Other Studies by Defendants' Experts

In addition to examining the remains, Defendants' experts researched and prepared reports on a variety of topics, including archaeological evidence regarding prehistoric human habitation in the southwestern Columbia Plateau, oral histories of the claimant tribes, linguistic studies, and an analysis of the lithic object embedded in the ilium. The experts' conclusions are discussed later in this Opinion.

### 7. Procedural Issues on Remand

Without disclosure to the public or the Plaintiffs, Defendants furnished the Tribal Claimants with advance copies of the cultural affiliation reports prepared by their experts. DOI 6982 (gave Tribal Claimants copies of draft expert reports no later than February 9, 2000); DOI 8695 (gave Tribal Claimants copies of Secretary's "final" expert reports no later than June 21, 2000, to be used in preparing their own submissions and comments, but requested that they restrict access to the reports because "we are not planning to release these reports to the public until the Department of

the Interior has made its decisions and recommendations in this matter").

The Tribal Claimants also received a private letter prepared by Dr. McManamon, a key decision maker for the Defendants, which articulated Defendants' concerns regarding the evidence supporting the claim for the remains. DOI 6982, 8695–96; 8703–05, 8713–19, 9101–02. Defendants urged the Tribal Claimants to supplement the record with expert reports of their own, and to otherwise address the issues that Defendants had identified. The Tribal Claimants responded by furnishing numerous reports to Defendants.[28]

Despite Plaintiffs' repeated requests for clarification of the issues and access to the administrative record, they were not given a similar opportunity. *See, e.g.,* ER 400–01, DOI 8228–29; June 20 Tr. at 320–21. Plaintiffs were permitted to submit documents, but had to do so without knowing specifically what they were commenting upon.

While preparing their final decision in this case, Defendants met privately with the Tribal Claimants at least once to dis-

---

("it is unlikely that further analysis of other elements (*e.g.,* teeth or a much larger portion of bone) would be successful"); DOI 10002 ("it is possible that methods developed in the near future could be successful in extracting suitable DNA for analysis from the Kennewick remains").

The bone samples used for the most recent DNA analysis were quite brittle and heavily mineralized, which is indicative of poor preservation of organics. DOI 9853. The poor condition of the bone is in marked contrast to the bone sample used for the 1996 testing. Similar differences were observed between the samples used for the 1996 and 1999 radiocarbon datings. DOI 5795, 5811, 5837, 5843. *See also,* DOI 5005 (collagen content of 1999 bone sample so low "that if this were any other bone the lab would have halted the AMS testing process").

**28.** *See, e.g.,* DOI 7592 (letter from Umatilla, dated March 2, 2000, stating that "[o]ur staff has reviewed the documentation prepared by

Interior on the cultural affiliation" and is submitting its own expert reports); DOI 7621–30 (report from Umatilla's expert, submitted on March 2, 2000, specifically commenting upon the reports prepared by Defendants' experts, even though the latter were not revealed to Plaintiffs or the public until after the final decision was announced in late September, 2000); DOI 9003–54 (report, submitted by Yakama on August 10, 2000, commenting upon the reports prepared by Defendants' experts); DOI 9055–9240 (reports, submitted by Colville on August 10, 2000, "submitted in response to Dr. F. McManamon's letter of July 24, 2000"); DOI 7304–10 (comments submitted by Nez Perce on February 28, 2000, in response to draft cultural affiliation reports by Defendants' experts that Plaintiffs were not allowed to see until seven months later).

cuss the merits of the cultural affiliation determination.[29] DOI 8695–8705, 9101–02, 9499. Defendants did not invite Plaintiffs to participate, nor did they otherwise disclose the substance of these communications.

Plaintiffs point to other documents which support the inference that Defendants are biased in favor of the Tribal Claimants. *See, e.g.*, COE 7905 ("I told [Armand Minthorn] we will do what the tribes decide to do with the remains"); COE 9311 ("the colonel has made [turning over the remains to the Tribal Claimants] his top priority"); (COE 9471a, ER 396) (internal Corps memo stating that "[t]he District needs to make [a] clear, unequivocal demonstration of its commitment to the tribes as being a compassionate and supportive partner in restoring the remains to a condition of proper interment with dignity and respect . . ."); ER 398 ( [Dr. Owsley] "and all other members of the scientific community have been denied direct access [to the Kennewick remains] because of the district's commitment to the tribal coalition"); COE 8663–77 (minutes of meeting between tribal representatives and Corps regarding management and construction of dams, fishing rights, and stream management, during which Kennewick Man issues were repeatedly raised). A number of these documents precede this court's Order vacating the Corps' original decision to award the remains to the Tribal Claimants.

## D. The Challenged Decisions

On January 13, 2000, the DOI announced its determination that the Kennewick remains are "Native American" as defined by NAGPRA. DOI 5816–21. The decision was premised on only two facts: the age of the remains, and their discovery

within the United States. The agency's Opinion stated:

> As defined in NAGPRA, "Native American" refers to human remains and cultural items relating to tribes, peoples, or cultures that resided within the area now encompassed by the United States prior to the historically documented arrival of European explorers, irrespective of when a particular group may have begun to reside in this area, and, irrespective of whether some or all of these groups were or were not culturally affiliated or biologically related to present-day Indian tribes.

DOI 5816. Applying that definition, the DOI concluded that the remains were "Native American" because they were "clearly pre-Columbian." DOI 5819.

On September 25, 2000, the DOI announced its final decision to award the Kennewick remains to a coalition of the Tribal Claimants. DOI 10012–17. The decision letter, signed by then-Secretary of the Interior Bruce Babbitt, found by a "preponderance of the evidence that the Kennewick remains are culturally affiliated with the present-day Indian tribe claimants." DOI 10016. The Secretary "further determined that a claim based on aboriginal occupation . . . is also a basis for the disposition of the Kennewick remains to the claimant Indian tribes." *Id.* Relying upon their determination that the remains were subject to NAGPRA, and that the remains should be awarded to the Tribal Claimants, Defendants again denied Plaintiffs' request to study the remains. DOI 10017, COE 0001–07. Defendants also rejected the contention that the study prohibition violates Plaintiffs' constitutional rights under the First and Fifth Amendments. *Id.*

---

29. The meetings at issue here are in *addition* to the earlier consultation meetings with Trib-

al representatives, such as those conducted in May and July of 1998. DOI 10661.

Plaintiffs then filed an Amended Complaint challenging these decisions, and asserting additional claims. The parties and the *amici curiae* fully briefed the issues, and the court heard two days of oral argument.

### E. Claims

Plaintiffs bring seven claims for relief. The first claim, brought pursuant to the Administrative Procedure Act (APA), 5 USC §§ 701–706, seeks judicial review of Defendants' decision on remand.

The second claim alleges several specific violations of NAGPRA.

The third claim alleges that Defendants violated the National Historic Preservation Act (NHPA), 16 USC § 470 *et seq.*, by burying the site where the remains of the Kennewick Man were found.

The fourth claim alleges that Defendants violated the Archaeological Resource Protection Act (ARPA), 16 USC § 470aa *et seq.*, by failing to maintain the Kennewick Man remains "for the benefit of the American people," failing to make the remains of the Kennewick Man available for scientific and educational purposes, and failing to properly curate the remains to ensure their long-term preservation as required by an earlier Order of this court.

The fifth claim alleges that Defendants violated the Freedom of Information Act (FOIA), 5 USC § 552, by failing to respond to Plaintiffs' requests for information.

The sixth claim, brought pursuant to the Declaratory Judgment Act, 28 USC § 2201, sets out Plaintiffs' demand for declaratory and injunctive relief based upon violations alleged in other claims.

The seventh claim, brought pursuant to 28 USC § 1361, seeks mandamus relief in the form of an Order compelling Defendants to allow Plaintiffs access to the remains of the Kennewick Man "for purposes of study, publication, teaching and scholarly debate."

In their prayer for relief, Plaintiffs request seventeen separate elements of declaratory and injunctive relief, and assert the right to recover the costs, disbursements, and reasonable attorney fees incurred in this action.

## II. JUDICIAL REVIEW OF DECISIONS MADE ON REMAND

### A. Legal Standards

Under the Administrative Procedure Act, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 USC § 706(2)(A); *Northwest Motorcycle Ass'n v. United States Dept. of Agriculture*, 18 F.3d 1468, 1471 (9th Cir.1994). The court is not empowered to substitute its judgment for that of the agency, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), or to set aside the agency's decision simply because the court, as an original matter, might have reached a different result. *See Arizona Cattle Growers' Ass'n v. United States Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001). However, the court is not relegated to the role of a "rubber stamp." *Id.*

An agency's decision must be based upon a "reasoned evaluation of the relevant factors." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). The agency must "articulate[ ] a rational connection between the facts found and the choice made," *Arizona Cattle Growers'*, 273 F.3d at 1236, and an "agency's explanation must be sufficient to permit effective judicial review." *Northwest Motorcycle*, 18 F.3d at 1478. *See also, In re Sang*

*Su Lee,* 277 F.3d 1338, 1342 (Fed.Cir. 2002). Although the court may uphold a decision "of less than ideal clarity if the agency's path may reasonably be determined," the court cannot infer an agency's reasoning from mere silence. *See, Beno v. Shalala,* 30 F.3d 1057, 1073–76 (9th Cir. 1994) (setting aside agency decision where there was no indication that the Secretary had considered materials submitted by the plaintiffs).

■ An agency decision will not be upheld under the arbitrary and capricious standard unless the court finds that the evidence before the agency provided a rational and ample basis for its decision. *Northwest Motorcycle,* 18 F.3d at 1471. An agency's decision may also be set aside if the agency has relied on factors that Congress has not intended the agency to consider, has entirely failed to consider an important aspect of the issue, has offered an explanation for its decision that runs counter to the evidence before the agency, or if the decision is so implausible that it could not be based on a difference in view or be the product of agency expertise. *Inland Empire Public Lands Council v. Glickman,* 88 F.3d 697, 701 (9th Cir.1996). In some circumstances, an agency's failure to gather or to consider relevant evidence is also grounds for setting aside the decision. *See, Mt. Diablo Hospital v. Shalala,* 3 F.3d 1226, 1232 (9th Cir.1993).

■ When an agency's decision turns upon the construction of a statute or regulation, the court must consider whether the agency correctly interpreted and applied the relevant legal standards.

### B. Compliance with Administrative Procedures Act

Plaintiffs contend that agency decision makers had improper *ex parte* contacts with other agencies, the Tribal Claimants, and Defendants' trial attorneys; foreclosed Plaintiffs' meaningful participation in the decision-making process; furnished the Tribal Claimants with advance copies of key reports and gave the Tribal Claimants an opportunity to rebut the reports and supplement their claims without affording those opportunities to Plaintiffs; failed to act as neutral and fair arbiters of the claim; and predetermined their decisions. Plaintiffs also assert that agency decision makers improperly failed to document all information on which the decision was based, including *ex parte* communications.

Adjudication of the Tribal Claimants' request for repatriation of the remains of the Kennewick Man presents somewhat unusual issues of administrative procedure. In a typical adjudication, *ex parte* contacts between agency employees involved in the decision-making process and "interested persons" outside the agency are not allowed. *See,* 5 USC § 557(d)(1); *Portland Audubon Society v. Endangered Species Committee,* 984 F.2d 1534, 1543 (9th Cir. 1993) ("We think it is a mockery of justice to even suggest that ... decisionmakers may be properly approached on the merits of a case during the pendency of an adjudication."). However, consultation with tribal claimants is specifically mandated under the regulations applicable to NAGPRA. *See,* 43 CFR §§ 10.4, 10.5 (federal agency to notify tribal organizations likely to be culturally affiliated with human remains; agency must share variety of information pertaining to resolution of cultural affiliation determination).

The parties have cited, and I have found, no reported decisions addressing these particular circumstances. In addition, the parties disagree as to whether a contested NAGPRA claim is an adjudication governed by 5 USC §§ 554 and 557(d)(1), and as to what procedural requirements apply if agency proceedings are not governed by those statutes.

I need not determine precisely what procedures were required, because the agency's decision must be vacated for substantive reasons regardless of the exact procedures that should have been followed. It is sufficient to note that decisions addressing the obligations of agencies under the APA in various contexts appear to uniformly require that, regardless of the particular method used to reach a decision, the decision-making process must be fair to all affected parties. *E.g., Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 910 (5th Cir.1983) (critical question in any challenge to the propriety of the method used by agency in reaching decision is whether procedure used is fair).

Based upon a familiarity with this litigation developed over a number of years and a thorough review of the record, I conclude that the final decisions challenged here were not made by neutral and unbiased decision makers in a fair process as is required under the APA. Though I am satisfied that the agency's *ex parte* contacts with the government's trial attorneys did not violate Plaintiffs' rights, I am concerned by the largely undisputed evidence that agency decision makers:

(1) secretly furnished the Tribal Claimants with advance copies of documents such as expert reports, which allowed the Claimants (and *only* the Claimants) to rebut the reports and submit responsive expert reports of their own before the administrative record closed; [30]

(2) secretly met with the Tribal Claimants at a critical time in the decision-making process to discuss the mental impressions of the decision makers and potential weaknesses in the claims, and gave the Claimants an *ex parte* opportunity to influence the decision makers and to supplement the record in response to these concerns; [31]

(3) secretly sent letters to the Tribal Claimants regarding the same; [32]

(4) secretly notified the Tribal Claimants that the aboriginal lands issue was under consideration so they could supplement the record before it closed; [33] and

(5) refused to allow Plaintiffs to see any of the expert reports or other materials in the record before the administrative record was closed and the final decision was made, and refused to clarify the issues under consideration. [34]

I am also concerned about the decision to cover the site where the remains of the Kennewick Man were found. Though the Corps cited erosion control as the purpose of the project, it appears that the Tribal Claimants' concern about further site investigation was the principal factor in the decision to cover the site. That action was consistent with Defendants' approach throughout this litigation, which has been marked by an appearance of bias. This course of conduct is especially troubling because the court set aside the original agency decision in this matter after determining that the Corps had prejudged the outcome and had suppressed any doubts about the proper result "in the interests of

**30.** DOI 6982, 8695. *See also,* DOI 7304–10, 7592, 7621–30, 9003–54, 9055–9240 (commenting on the expert reports long before they were made public).

**31.** DOI 8695–8705, 9101–02, 9247–54, 9499.

**32.** DOI 6982, 8695–96, 8703–05, 8713–19, 9101–02.

**33.** On August 11, 2000, only weeks before the Secretary announced the final decision and shortly after the Tribal Claimants met privately with Defendants to discuss the merits of the case, the Yakama placed 170 pages of documents regarding the ICC issue into the administrative record. COE 2774–75, 2826–2995.

**34.** ER 400–01, DOI 8228–29.

fostering a climate of cooperation with the tribes." *Bonnichsen*, 969 F.Supp. at 642.

Resolution of the present dispute concerning Defendants' decision-making process does not require a full explication of the "consultation" requirements of the relevant regulations. It is sufficient to note that the primary purpose of consultation appears to be to inform those who may be affiliated with cultural items of their discovery and proposed disposition. Nothing in these regulations requires an agency to assume that particular items meet the statutory definitions of "Native American" or "cultural affiliation," or to side with claimants in any dispute or litigation, or prevents an agency from furnishing the same information to tribal claimants and others interested in the agency's determination. Nothing in NAGPRA or related regulations appears to in any way lessen an agency's obligation to make fair and unbiased decisions concerning claims for discovered items to which the Act might apply. Nothing in the provisions for "consultation" appears to allow an agency to collude with a claimant when a third party challenges a proposed disposition.

Under the APA, a court may set aside an agency action which it determines is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 USC § 706(2)(A) & (D); *Natural Resources Defense Council v. Houston*, 146 F.3d 1118, 1125 (9th Cir. 1998). A fair reading of the record before the court leads to the conclusion that, since the time the Corps took possession of the remains of the Kennewick Man, Defendants have not acted as the fair and neutral decision makers required by the APA. However, I need not decide whether this unfairness in itself is sufficient to set aside the Secretary's decision. As discussed below, the Secretary's decisions must be set aside on substantive grounds, and it ap-

pears that a remand with instructions to fairly reevaluate the issues again would be futile. The Secretary has developed a voluminous record which the court has reviewed, and the parties have vigorously litigated this matter over the course of several years. Under these circumstances, judicial economy and the parties' interest in resolving this litigation favor addressing the more substantive issues.

No useful purpose would be served by remanding the decision to the Secretary with instructions to again reevaluate the issues and to again revisit Plaintiffs' request to study in light of the court's analysis set out below. Defendants have had ample opportunity to develop and fairly evaluate the record and to make an unbiased decision, and there is no reason to believe that another remand would yield a different approach or result.

### C. Definition of Native American

As the first step in his determination that the Tribal Claimants are entitled to the remains, the Secretary found that the Kennewick Man is "Native American" within the meaning of NAGPRA.

NAGPRA defines "Native American" as "of, or relating to, a tribe, people, or culture that is indigenous to the United States." 25 USC § 3001(9). However, in determining that the Kennewick Man is "Native American," the Secretary defined this term as referring to

> human remains and cultural items that resided within the area now encompassed by the United States prior to the historically documented arrival of European explorers, irrespective of when a particular group may have begun to reside in this area, and, irrespective of whether some or all of these groups were or were not culturally affiliated or biologically related to present-day Indian Tribes.

DOI 10018. Defendants have clarified that, according to this definition, "Native American" refers to any remains or other cultural items that existed in the area now covered by the United States before 1492. DOI 06048, 06050. Under this definition, regardless of their origins or history, all remains and other cultural items found in the United States that are now more than 510 years old are deemed "Native American" for the purposes of NAGPRA, even if they have no relationship to a present-day "tribe, people or culture."

In analyzing the Secretary's determination that the remains are "Native American," the threshold question is whether the Secretary's definition is binding on this court. Defendants and the Tribal Claimants cite *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), in support of their contention that the court should defer to the Secretary's definition. They also contend that the court should defer to the agency's "longstanding" interpretation of the statute.

Defendants' arguments are not persuasive. "*Chevron* deference" is the deference to which an agency's reasonable statutory interpretation is entitled where Congress has "delegated authority to the agency, generally to make rules carrying the force of law, and ... the agency interpretation claiming deference was promulgated in exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). In most cases where *Chevron* deference has been applied, the agency's interpretation has been the result of a process of notice and comment rule-making or formal adjudication, which the agency did not undertake here. *See, Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (interpretations "in opinion letter—like interpretations contained in policy statements, agency manuals, and enforce-ment guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference"); *Martin v. Occupational Safety and Health Review Com'n*, 499 U.S. 144, 157, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) (interpretive rules are not enti-tled to *Chevron* deference); *Hall v. Unit-ed States Environmental Protection Agency*, 273 F.3d 1146, 1155–56 (9th Cir. 2001).

Although the Secretary has rule-making authority, the interpretation at issue here was not enacted by any formal process. Instead, it is a statutory interpretation that was first announced by the Secre-tary's counsel during the course of this litigation. Accordingly, the interpretation is not the type of decision to which *Chev-ron* deference ordinarily applies.

Defendants' contention that the court should defer to the agency's "longstand-ing" interpretation of the statute that al-lows for classification of the remains based solely upon age also fails. I find no sup-port for the assertion that the agency has consistently taken the position that age alone suffices to determine "Native Ameri-can" status. In response to a hypothetical posed during a hearing on June 2, 1997, Defendants indicated that NAGPRA would *not* govern the disposition of pre-Colum-bian remains that, for example, were clear-ly African and not American Indian. COE 7360–61. The Secretary's subsequent de-cision that all remains and other cultural items predating 1492 are "Native Ameri-can" cannot be fairly characterized as "longstanding."

■ The objective of statutory inter-pretation is to ascertain the intent of Con-gress. *United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir.1999). The inquiry begins with the plain language of the stat-ute. *Id.* Courts look to the entire statuto-ry scheme to determine the plain meaning and congressional intent of a particular statutory provision, and give terms that

are not defined by statute their ordinary meaning. *Id.* When interpreting statutes, courts do not assume that Congress intended to create odd or absurd results. *United States v. X–Citement Video, Inc.,* 513 U.S. 64, 69–70, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994) (*citing Public Citizen v. United States Department of Justice,* 491 U.S. 440, 453–455, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989)).

■ As noted above, NAGPRA defines "Native American" as "of, or *relating* to, a tribe, people, or culture that *is* indigenous to the United States." § 3001(9) (emphasis added). Giving the "plain language" of this provision its ordinary meaning, use of the words "is" and "relating" in the present tense requires a relationship to a presently existing tribe, people, or culture. This is consistent with the Act's definition of the term "sacred objects" as meaning "ceremonial objects which *are* needed by traditional Native American religious leaders for the practice of traditional Native American religions *by their present day adherents.*" 25 USC § 3001(3)(C) (emphasis added).

From this consistent use of the present tense, it is reasonable to infer that Congress intended the term "Native American" to require some relationship between remains or other cultural items and an existing tribe, people, or culture that is indigenous. The present-day people who are indigenous to the 48 contiguous states of the United States are, of course, the people who have been known as American Indians for hundreds of years. Interpreting the statute as requiring a "present-day relationship" is consistent with the goals of NAGPRA: Allowing tribes and individuals to protect and claim remains, graves, and cultural objects to which they have some relationship, but not allowing them to take custody of remains and cultural objects of

persons and people to whom they are wholly unrelated.

The literal statutory definition of Native American, as applied to the continental United States, is also consistent with the common usage of the term. When the statute was enacted in 1990, the term "Native American" had become synonymous with "American Indian." [35] It is obvious from the text of NAGPRA that Congress intended to include Alaska Natives and Native Hawaiians within the definition. However, as to the contiguous 48 states, nothing in the statute indicates that Congress intended to define Native American as including people or objects with no relationship to present-day American Indians.

As noted above, courts do not assume that Congress intends to create odd or absurd results. The potential for such results under the Defendants' definition of "Native American" further supports the conclusion that their definition is incorrect. Under that definition, all pre-Columbian remains and objects would be treated as Native American, "irrespective of when" a group arrived and regardless of whether the individuals are related in any way to present-day American Indians. Application of this definition could yield some odd results. The origin of the earliest Americans is an unresolved question. According to one theory with some support in the record, beginning up to 30,000 to 40,000 years ago, multiple waves of immigrants separated by thousands of years, with different points of origin and modes of travel, came into this hemisphere. *See, e.g.,* DOI 0631, 0956, 1508, 2143–45, 2177–85, 2786–99, 3203, 3425–26, 3930, 3940–64, 4269, 6704–05, 6850–51, 7236, 7861–66, 7888, 8206–09, 9547–48, COE 4747, 8036–40. Limited studies conducted on very old remains suggest that the peopling of the Americas was complex. *See, e.g.,* DOI

---

**35.** For example, the 1989 Encyclopedia Edition of the *New Lexicon Webster's Dictionary* defines "Native American" as "American Indian."

9548 (very ancient skulls found on this continent "more closely resemble southern Asian and Pacific Rim populations, while modern Native Americans bear close resemblance to northern Asian groups"). Some studies of ancient remains show little apparent affinity between ancient skulls and present-day American Indians (or any other modern group), and often show little affinity among the ancient remains themselves. *See, e.g.,* DOI 1721–22, 2251–52, 3863–67, 3930, 8186, 8944, 9548, 10441–42. There is also evidence in the record that differences in appearance may reflect genetic differences between ancient samples and more recent American Indians and northern Asian populations. DOI 3930–31, 5944–46.

Under the Defendants' interpretation, possibly long—extinct immigrant peoples who may have differed significantly—genetically and culturally—from any surviving groups, would all be uniformly classified as "Native American" based solely upon the age of their remains.[36] *All* pre-Columbian people, no matter what group they belonged to, where they came from, how long they or their group survived, or how greatly they differed from the ancestors of present-day American Indians, would be arbitrarily classified as "Native American," and their remains and artifacts could be placed totally off-limits to scientific study.[37] This court cannot presume that Congress intended that a statutory definition of "Native American" requiring a relationship to a "tribe, people, or culture that is indigenous to the United States" yield such far-reaching results.[38]

The Secretary erred in defining "Native American" to automatically include all remains predating 1492 that are found in the United States. Nevertheless, the Secretary's ultimate determination that the remains of the Kennewick Man are "Native American" under NAGPRA is erroneous only if the administrative record contains insufficient evidence to support the conclusion that the remains are related to a present-day tribe, people, or culture that is indigenous to the United States as required by the statute. NAGPRA recognizes two distinct kinds of relationships: The first is the general relationship to a present-day tribe, people, or culture that establishes that a person or item is "Native American." The second, more narrowly defined specific relationship estab-

---

**36.** At a hearing held on September 14, 1999, Defendants acknowledged that, under their definition, 12,000 year old European remains found in the United States would be classified as "Native American." Though Defendants later retreated somewhat from that position, their definition could have far reaching implications. Consider, for example what would happen if a 25,000–year–old skeleton that could be conclusively proven to be totally unrelated to any American Indians was found on "aboriginal land." Under the Secretary's definition, those remains would be conclusively presumed to be "Native American" under NAGPRA. As the DOI Solicitor noted in a letter to the Secretary, under 25 USC § 3002 remains that are so defined go to a tribe "regardless of whether the available evidence shows any connection whatsoever between the remains and the tribe ... no further questions asked...." DOI 10088.

**37.** Under 25 USC § 3002(a)(2)(C), objects defined as "Native American" found on federal land recognized as the "aboriginal land" of a tribe may be given to that tribe without any showing of cultural affiliation. Vast tracts of federal land are subject to such judgments. As discussed later in this Opinion, recognition of an area as "aboriginal land" does not necessarily mean that it has been the domain of a tribe for a long period of time. (See Aboriginal Lands section below.)

**38.** Even if *Chevron*-style deference were otherwise appropriate, this conclusion would not change: Courts defer only to an agency's "permissible" and "reasonable" statutory interpretations. *See, e.g., Arizona Cattle Growers' Ass'n,* 273 F.3d at 1236.

lishes that a person or item defined as "Native American" is also "culturally affiliated" with a particular present-day tribe.

The requirements for establishing "Native American" status under NAGPRA are not onerous. They may be satisfied not only by showing a relationship to existing tribes or people, but also by showing a relationship to a present-day "culture" that *is* indigenous to the United States. The culture that is indigenous to the 48 contiguous states is the American Indian culture, which was here long before the arrival of modern Europeans and continues today.

It is clear from the full text of NAGPRA that the cultural relationship required to meet the definition of "Native American" is less than that required to meet the definition of "cultural affiliation," which is discussed in detail later in this Opinion. For example, American Indian groups that became extinct since 1492 are no doubt culturally related to current American Indians, and are therefore "Native American" under the terms of NAGPRA. It is also clear from the record that a cultural relationship could be established for many people and items from prehistoric times. However, this case involves one particular set of 9,000–year–old remains, and it is the relationship to those remains that must be analyzed here.

■ The term "Native American" requires, at a minimum, a cultural relation- ship between remains or other cultural items and a present-day tribe, people, or culture indigenous to the United States. A thorough review of the 22,000–page administrative record does not reveal the existence of evidence from which that relationship may be established in this case.[39] The evidence in the record would not support a finding that Kennewick Man is related to *any* particular identifiable group or culture, and the group and culture to which he belonged may have died out thousands of years ago. Though the cranial measurements and features of Kennewick Man most closely resemble those of Polynesians and southern Asians, these characteristics differ from those of any modern group living in North America or anywhere else. DOI 05879, 05885, 10067–68, 10665, 10685–92. Kennewick Man's culture is unknown and apparently unknowable.

As is perhaps not surprising with remains more than 9,000 years old, there is not evidence that will support the conclusion that the remains are "of, or relating to, a tribe, people, or culture that is indigenous to the United States." The record would not support a finding that the ancestors of the American Indians were the only people here in prehistoric times, or that only one culture existed throughout prehistoric times. Congress did not create a presumption that items of a particular age are "Native American."[40] Therefore, the

---

**39.** In determining whether there is evidence in the record that would support the conclusion that the remains of the Kennewick Man are "Native American," I have thoroughly reviewed the material upon which the Secretary's "cultural affiliation" determination was based. The analysis of cultural affiliation set out below is relevant to the question whether the remains are "Native American" within the meaning of NAGPRA because it addresses the evidence of any relationship between the Kennewick Man and present-day American Indians. Because that exhaustive record would simply not support the conclusion that

the remains are "Native American," no useful purpose would be served by remanding this action to the agency for reconsideration under the correct statutory definition.

**40.** Nor is there a basis for writing such a presumption into NAGPRA through an "Indian canon of construction." Under this rule of statutory construction, "doubtful expressions" in legislation passed for the benefit of Indian tribes are "resolved in favor of the Indians." *Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 89, 39 S.Ct. 40, 63 L.Ed. 138 (1918). This canon applies only where a statute is

Secretary did not have sufficient evidence to conclude that the Kennewick Man remains are "Native American" under NAGPRA.[41] Without such a finding, NAGPRA does not apply to the remains. *See,* 25 USC § 3002(a) (setting out priority of "ownership or control of *Native American* cultural items") (emphasis added); DOI 10012 (initial determination that remains were Native American "triggered" application of NAGPRA). Therefore, the disposition of the remains is governed by the application of other Federal law as set forth later in this Opinion.

### D. Cultural Affiliation

The Secretary misinterprets the term "Native American" and the record will not support the conclusion that the remains are "Native American" under the terms of NAGPRA. It is therefore arguably unnecessary to review the Secretary's related conclusion that the remains are culturally affiliated to a coalition of tribal claimants. I conclude that review of the Secretary's cultural affiliation analysis is nevertheless appropriate. As noted above, I needed to

review all the material related to the Secretary's cultural affiliation analysis to determine whether that material included evidence that would support the conclusion that the remains satisfied the definition of "Native American." Because I have thoroughly reviewed this record, judicial economy favors creating a complete record for possible appellate review, and perhaps avoiding more delays in this litigation.

NAGPRA provides that the "ownership or control" of Native American cultural items (including human remains) excavated or discovered on Federal or tribal lands after November 16, 1990, shall be (with priority given in the order listed)—

(1) in the case of Native American human remains and associated funerary objects, in the lineal descendants of the Native American; or

(2) in any case in which such lineal descendants cannot be ascertained, and in the case of unassociated funerary objects, sacred objects, and objects of cultural patrimony—

 (A) in the Indian tribe or Native Hawaiian organization on whose tribal

---

ambiguous. *South Carolina v. Catawba Indian Tribe,* 476 U.S. 498, 506, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986). Even assuming that NAGPRA is the kind of "Indian legislation" to which the canon might apply, there is no ambiguity in the Act that would permit a presumption that items of a certain age found on federal land are "Native American."

Moreover, the issue is not whether Indian tribes are entitled to recover the remains and cultural objects of their own ancestors, but whether they also are entitled to claim remains and cultural objects having no demonstrated link to any present-day tribe or to modern American Indians in general. The Indian canons of construction offer little help in resolving that question, which does not implicate the validity, interpretation, or abrogation of a treaty, or the right to Indian self-government. Nor is there a "unique trust relationship" between the United States and an unknown group to which the Kennewick Man belonged 9,000 years ago. *Yankton*

*Sioux Tribe v. United States Army Corps of Engineers,* 83 F Supp 2d 1047, 1055–56 (D.S.D.2000), cited by both Defendants and the Tribal Claimants, is readily distinguishable. The remains in *Yankton* were definitively linked to the Sioux tribe, which has a special relationship with the United States. In addition, since the burials occurred between 1874 and 1900, the deceased were themselves "wards" of the United States entitled to its protections.

**41.** It is not the role of the court to determine whether the Kennewick Man is or is not "Native American" under the terms of NAGPRA. Instead, it is the role of the court to determine whether the Secretary correctly applied the law and whether the record will support the Secretary's findings. The court is simply concluding that the record will not support the Secretary's affirmative finding that the remains are "Native American" as defined under NAGPRA.

land such objects or remains were discovered;

(B) in the Indian tribe or Native Hawaiian organization which has the closest cultural affiliation with such remains or objects and which, upon notice, states a claim for such remains or objects; or

(C) if the cultural affiliation of the objects cannot be reasonably ascertained and if the objects were discovered on Federal land that is recognized by a final judgment of the Indian Claims Commission or the United States Court of Claims as the aboriginal land of some Indian tribe—

(1) in the Indian tribe that is recognized as aboriginally occupying the area in which the objects were discovered, if upon notice, such tribe states a claim for such remains or objects, or

(2) if it can be shown by a preponderance of the evidence that a different tribe has a stronger cultural relationship with the remains or objects than the tribe or organization specified in paragraph (1), in the Indian tribe that has the strongest demonstrated relationship, if upon notice, such tribe states a claim for such remains or objects.

25 USC § 3002(a).

The parties agree that the lineal descendants of the Kennewick Man, if any, cannot be ascertained, and the remains were not found on tribal land. Consequently, the next question is whether the "cultural affiliation" of the remains can be "reasonably ascertained."

" 'Cultural affiliation' " is defined as "a relationship of shared group identity which can be reasonably traced historically or prehistorically between a present day Indian tribe ... and an identifiable earlier group." 25 USC § 3001(2).

The Secretary has promulgated regulations describing how cultural affiliation is established. Under these regulations, "cultural affiliation is established when the preponderance of the evidence—based on geographical, kinship, biological, archeological, linguistic, folklore, oral tradition, historical evidence, or other information or expert opinion—reasonably leads to such a conclusion." 43 CFR § 10.2(e). The regulations further provide:

(c) Criteria for determining cultural affiliation. Cultural affiliation means a relationship of shared group identity that may be reasonably traced historically or prehistorically between a present-day Indian tribe or Native Hawaiian organization and an identifiable earlier group. All of the following requirements must be met to determine cultural affiliation between a present-day Indian tribe ... and the human remains, funerary objects, sacred objects, or objects of cultural patrimony of an earlier group:

(1) Existence of an identifiable present-day Indian tribe ... with standing under these regulations and the Act; and

(2) Evidence of the existence of an identifiable earlier group. Support for this requirement may include, but is not necessarily limited to evidence sufficient to:

(i) Establish the identity and cultural characteristics of the earlier group,

(ii) Document distinct patterns of material culture manufacture and distribution methods for the earlier group, or

(iii) Establish the existence of the earlier group as a biologically distinct population; and

(3) Evidence of the existence of a shared group identity that can be reasonably traced between the present-

day Indian tribe ... and the earlier group. Evidence to support this requirement must establish that a present-day Indian tribe ... has been identified from prehistoric or historic times to the present as descending from the earlier group.

(d) A finding of cultural affiliation should be based upon an overall evaluation of the totality of the circumstances and evidence pertaining to the connection between the claimant and the material being claimed and should not be precluded solely because of some gaps in the record.

(e) Evidence. Evidence of a kin or cultural affiliation between a present-day individual, Indian tribe ... and human remains, funerary objects, sacred objects, or objects of cultural patrimony must be established by using the following types of evidence: Geographical, kinship, biological, archeological, anthropological, linguistic, folklore, oral tradition, historical, or other relevant information or expert opinion.

(f) Standard of proof. Lineal descent of a present-day individual from an earlier individual and cultural affiliation of a present-day Indian tribe ... to human remains, funerary objects, sacred objects, or objects of cultural patrimony must be established by a preponderance of the evidence. Claimants do not have to establish cultural affiliation with scientific certainty.

43 CFR § 10.14.

The Secretary found a cultural affiliation between the remains and the Tribal Claimants. In his decision awarding the remains to the Tribal Claimants, he stated that there is "a reasonable link between these remains and the present-day Indian tribe claimants." DOI 10015.

### 1. Coalition as Claimant

██ To create a full record, before addressing the Secretary's cultural affiliation determination, this court must review the Secretary's conclusion that a coalition of four federally recognized Indian tribes and a band that is not federally recognized (together the Tribal Claimants)[42] is a proper claimant for purposes of 25 USC § 3002.[43] The Secretary asserted that this coalition is a proper claimant because:

[T]he statute and regulations do not specifically answer whether cultural affiliation with a single identifiable tribe is required, or whether such affiliation may be established with a group of modern-day Indian tribes filing a joint claim. Section 3002(a)(2)(B) speaks of an Indian tribe with the "closest cultural affiliation," which suggests a congressional recognition that more than one, and perhaps many, tribes may have a cultural affiliation with remains discovered on federal land. We believe the statute permits finding cultural affiliation with one or more of multiple tribes where, as here, they submit a joint claim.

DOI 10014.

The Secretary's analysis contradicts the plain language of the statute, which identifies the appropriate recipient in the singular as "*the* Indian tribe ... which has the closest cultural affiliation." 25 USC § 3002(a)(2)(B) (emphasis added). Use of the term "tribe" in the singular in 25 USC § 3002(a)(2)(B) is also consistent with references to a single tribe in other NAGPRA

---

**42.** A non-federally recognized band is not a proper NAGPRA claimant. *See*, 25 USC § 3001(7). The Secretary acknowledged this in his decision letter, but reasoned that the coalition as a whole had standing to assert a NAGPRA claim because the other four members are federally recognized tribes. DOI 10017, n 1.

**43.** Given this court's other decisions in this Opinion, this issue is relatively insignificant.

provisions and the Secretary's own regulation addressing cultural affiliation. Cultural affiliation requires proof of a relationship of shared group identity "between *a* present day Indian tribe ... and an identifiable earlier group." 25 USC § 3001(2) (emphasis added). *See also*, 25 USC § 3005(a)(1) (providing for repatriation if "the cultural affiliation of Native American human remains and associated funerary objects with *a particular Indian tribe or Native Hawaiian organization* is established ...") (emphasis added); 43 CFR § 10.14(c)(3)(C) ("Evidence ... must establish that a present-day Indian tribe ... has been identified from prehistoric or historic times as descending from the earlier group.").[44]

The Secretary's analysis could render part of the statute meaningless. Carried to the logical end, coalition claims would effectively eliminate the statutory requirement that cultural affiliation be established with a particular modern tribe. The more members in a coalition, the greater the likelihood that the remains or objects are affiliated with *some* member of the coalition, despite a lack of evidence establishing cultural affiliation with any particular member of the coalition.

The plain language of the statute does not support the conclusion that joint claims by a number of tribes—based on little more than some degree of contact with the general region at some prior time—are generally sufficient to satisfy NAGPRA's cultural affiliation requirement. There may be some circumstances under which joint claims are proper.[45] However, a fair reading of the statute and related regulations supports only the conclusion that, under any circumstances, the claims of coalition members must be independently meritorious. Accordingly, the Tribal Claimants' joint claim for the Kennewick Man remains cannot be sustained unless at least one member of the coalition independently satisfies the cultural affiliation standard.

The Secretary asserts that separate analysis of the relationship of the remains and each individual Tribal Claimant is not legally required, DOI 10014, and appears to have made no real effort to analyze the claims separately. Instead, the Tribal Claimants were treated as a single entity that collectively comprises the present-day embodiment of the ancient group to which the Kennewick Man assertedly belonged. *See, e.g.*, DOI 10015 (evaluating "the cultural relationship between *the two groups*," *i.e.*, the ancient group and the Tribal Claimants collectively) (emphasis added).[46]

Defendants now assert, however, that the Secretary "evaluated each tribe's claim individually." Defendants' Brief at 22. That assertion is contradicted by both the Secretary's written decision and the ad-

**44.** Defendants incorrectly assert that 43 CFR § 10.14 explicitly authorizes coalition claims. Defendants' Brief at 21. It does not.

**45.** For example, there may be instances in which two tribes both have valid claims because they descended from the same identifiable earlier group and have a shared group identity. A tribe may have been forcibly separated by the United States government, with its members sent to different reservations. In such circumstances, the intent of Congress would not be served by denying repatriation to either tribe, or by forcing the tribes to compete with each other if both satisfy the cultural affiliation standard and neither wishes to contest the other's claim.

Many of the cultural affiliation determinations published in the Federal Register apparently involve multiple claimants. *See*, Defendants' Brief at 22. However, the propriety of dispositions to coalitions appears to be a question of first impression. The parties have cited, and I have found, no decisions addressing the question whether NAGPRA allows for disposition to coalitions.

**46.** *See also*, DOI 5164 (memo from one of the Secretary's experts requesting clarification regarding scope of cultural affiliation study).

ministrative record.[47] The reports from the Secretary's experts make little effort to separately evaluate the relationship of the remains to the individual claimants, and the Secretary's decision awarding the remains does not separately weigh the evidence of cultural affiliation for each claimant tribe. In addition, the claim states that it is asserted collectively, not individually. *See*, DOI 4109 (claim is filed "jointly" and "supercedes all prior separate individual claims made by [the five claimants]").

Under the terms of NAGPRA and relevant regulations, coalition claims are inappropriate except under exceptional circumstances that are not relevant here. Though the Secretary now asserts that the claims of the coalition members were analyzed individually, it is clear from the record that the Tribal Claimants asserted their claim collectively, and that Defendants did not separately evaluate the relationship of each individual claimant tribe to the remains of the Kennewick Man. Accordingly, I conclude that the Secretary erred in assuming that the coalition was a proper claimant and in failing to separately analyze the relationship of the particular Tribal Claimants to the remains.

### 2. Cultural Affiliation Determination

#### a. Introduction

 A finding of "cultural affiliation" with human remains requires proof of "a relationship of *shared group identity* which can reasonably be traced ... be-

tween a present day Indian tribe ... and *an identifiable earlier group*" of which the decedent was a member. 25 USC § 3001(2) (emphasis added). *See also*, S Rep No 101–473 at 8 (claimant must show "a continuity of group identity from the earlier to the present day group").

Linking an individual who died more than 9,000 years ago to an identifiable ancient group presents a difficult challenge. Going beyond that and establishing a shared group identity between that ancient group and a present-day Indian tribe greatly compounds the difficulty.

The Secretary's task was especially difficult here because the only information concerning the Kennewick Man consists of his skeletal remains, the location where the remains were found, the projectile point embedded in his pelvis, and the age of the remains. By prohibiting detailed scientific investigation of the discovery site, and then burying it, the Corps foreclosed the possibility that other cultural artifacts or information associated with this individual might be found that could aid in determining cultural affiliation.

Based on a careful review of the record, I conclude that the Secretary's cultural affiliation determination cannot be sustained. The Secretary: (a) did not adequately determine "an identifiable earlier group" to which the Kennewick Man allegedly belonged, or even establish that he belonged to a particular group, (b) did not

---

**47.** Defendants treated the claimants as a "coalition" from the earliest days of this case, even before a formal coalition claim was filed. *See*, DOI 01598 (letter from Corps describing early events in this case); COE 4805 AA. *See also*, DOI 1440–49 (letters from Corps requesting clarification regarding nature of claim); DOI 1450 (1996 letter from Umatilla to Corps clarifying that the individual claim was filed "only to preserve" a claim pending the filing of the coalition claim); DOI 1373 (letter from Yakama declining to assert individual claim and confirming that claim is joint); DOI 1498 (*1997 letter from Corps to Plaintiffs regarding coalition claim*); DOI 3376 (letter from Colville indicating that "the Tribes will request repatriation as a coalition, thus negating the need for tests to clarify affiliation" and also asserting that "an agreement on methods of determining [cultural] affiliation should not need to appease either the Court or any other parties"); DOI 3610 (1998 letter from Umatilla to Dr. McManamon, with multiple references to the "Tribal Coalition").

adequately address the requirement of a "shared group identity," (c) did not articulate a reasoned basis for the decision in light of the record, and (d) reached a conclusion that is not supported by the reasonable conclusions of the Secretary's experts or the record as a whole.

Based upon the record, the Secretary could have reasonably concluded that ancestors of the Tribal Claimants have resided in this region for a very long time. However, the Kennewick remains are *so* old, and information as to his era *so* limited, that it is impossible to say whether the Kennewick Man is related to the present-day Tribal Claimants, or whether there is a shared group identity between his group and any of the Tribal Claimants. The record simply does not establish the requisite link by a preponderance of the evidence. Thus, this record will not support a finding of cultural affiliation.

### b. Defining The Identifiable Earlier Group

Although it is essential to the analysis, the Secretary never specified the "identifiable earlier group" to which the Kennewick Man belonged. Instead, the Secretary focused primarily on establishing that some ancestors of the Tribal Claimants probably resided in this general region 9,000 years ago or, at least, that this possibility cannot be ruled out. This hypothesis is plausible because there is reason to believe that ancestors of the Tribal Claimants may have been present in this hemisphere 9,000 years ago. However, even if the Secretary succeeded in establishing that ancestors of the Tribal Claimants resided in this general region 9,000 years ago, that in itself would not establish by a preponderance of the evidence that the Kennewick Man was one of those ancestors, which group *he* belonged to, or a continuity of group identity during the intervening 9,000 years.

The Secretary's decision refers to "the cultural group that existed in the Columbia Plateau region during the lifetime of the Kennewick Man" as if there were only one group in this large area (which encompasses substantial parts of two states) during that time. DOI 10015. However, the record indicates that as many as 20 different highly mobile groups, each including anywhere from 175 to 500 members, may have resided in the region around this time. DOI 10058, 10136. The Secretary appears to assume, without pointing to any support in the record, that these groups were culturally identical. In another document, the Secretary attempts, in the most general terms, to describe possible characteristics and activities of the "human cultural groups, of which Kennewick Man would have been a member." *See, e.g.,* DOI 10058–60. In other words, the record indicates that an unknown number of groups were in the region, and the Secretary assumes the Kennewick Man was affiliated with one of those groups. However, because the Secretary is unable to determine which group he was affiliated with, the Kennewick Man's group cannot be classified as an identifiable earlier group as required to establish cultural affiliation under NAGPRA.

The Secretary does not explain how it is possible to analyze "continuity between the cultural group represented by the Kennewick human remains and the modern-day claimant Indian tribes," DOI 10015, without first identifying the group that the Kennewick Man belonged to and that group's cultural characteristics. The closest the Secretary comes to designating the "identifiable earlier group" to which he believes the Kennewick Man belonged is to assert that this group would have been part of either the "Windust Phase" or "Early Cascade Phase." DOI 10054. These phases are broad labels used to demarcate eras of several thousand years each, based largely upon the predominant

types and styles of projectile points and tools that have been found at various locations in the Pacific Northwest. These locations include parts of Idaho, Oregon, Washington, and British Columbia, but are primarily in the Lower Snake River Canyon (and its tributaries) in eastern Washington and western Idaho. DOI 9073–74. The Secretary indicates that the period from approximately 13,000 years ago until 9,000 years ago has been labeled the Windust Phase, and the period from approximately 9,000 until about 7,000 years ago has been labeled the Early Cascade Phase. DOI 10054. Others have apparently assigned different names and/or dates to these periods, or have applied these terms to different locations in the region. *Cf.,* DOI 9071, 10112–13, 10133–35, 10224–26.

There are several problems with characterizing people from the entire "Windust Phase" and "Early Cascade Phase" as a single identifiable earlier group for purposes of NAGPRA. Even assuming that people associated with a broad "phase" could be characterized as an "identifiable earlier group," the record does not contain sufficient evidence to link the Kennewick Man to that "group." Further, the Secretary does not identify which of the "phases" the Kennewick Man is associated with. Scholars do not agree whether the "Early Cascade Phase" was a continuation of the "Windust Phase" by the same population with minor changes in tools, or whether the two phases represent different origins and populations. Evidence that the Kennewick Man was morphologically distinct from present-day populations in this region lends some support to the theory that more than one population may have been present during that time period.

The Secretary acknowledges the difficulties this morphological data poses, but never explains how he resolves that issue in reaching his final decision. DOI 10015.

The Secretary's attempt to equate the Windust and Early Cascade phases to an "identifiable earlier group" assumes that, because ancient tools and projectile points were discovered at sites some distance from where the remains of the Kennewick Man were found,[48] a single group or culture fabricated all of those objects, and that the Kennewick Man was part of that group. Such an assumption is not supported either by logic or the administrative record. On this record, it is impossible to say whether the Kennewick Man was a member of a group that fabricated those particular items, whether he spent most of his life near the site where he died, whether any other groups or cultures existed in the region during that time period, or whether similarities in tools or weapons equate to similarities in other respects or to a shared group identity.

There are also problems with the Secretary's assumption that the Kennewick Man's group lived near where the remains were found, with the significance accorded to the projectile point embedded in the Kennewick Man's pelvis, and with the analysis of the significant physical differences between the Kennewick Man and modern American Indians. The Secretary's analysis implicitly presumed, without explanation, that the Kennewick Man's group resided (and continues to reside) near where his remains were discovered. However, as the Secretary acknowledged, there were no villages or permanent settlements in this region 9,000 years ago. DOI 10076. The "more or less sedentary set-

48. Few, if any, of those ancient sites are closer than 40 miles from the discovery site, and most are considerably farther away. *See,* DOI 9073–76, 10228. *See also,* DOI 2117 (while there are many archaeological sites in the "Tri-Cities" area where the Kennewick Man was found, none is older than the Cayuse Phase (250–2500 years BP), and many are no more than 200 years old).

tlement system"—which the Secretary's experts believe was the antecedent of the villages and bands aggregated into the present tribes during the 19th Century— was not established until "between about 3000 and 2000 years ago." DOI 10058. Groups occupying this region 9,000 years ago are thought to have been nomadic, traveling long distances in search of food or raw materials such as obsidian and shells. DOI 10058–61, 10136. The remains of the Kennewick Man were found at a natural crossroads near the confluence of several major river systems. DOI 10274, 10283.

Though Defendants assert that the projectile point embedded in the Kennewick Man's pelvis established that he belonged to the group that made it, evidence regarding the point is inconclusive at best. The record does not tell us whether the wound was inflicted by a member of the Kennewick Man's own group or if it was inflicted by a rival group or culture. As the Yakama Nation observed, in objecting to studies of the point:

> Further analyses of the lithic object may provide some few facts about the object itself, but, can say precious little about whether the person in which it is embedded is or is not "Native American."

DOI 3370.

If this particular point is related to subsequent versions of the projectile style spanning the millenia, it might suggest that the Tribal Claimants are linked to *someone* who resided in this region 9,000 years ago. But it is impossible to determine whether they are linked in any way to the particular group to which the Kennewick Man belonged. Moreover, as one of the Secretary's experts observed, continuity in weapons technology does not necessarily equate to cultural continuity or the maintenance of a shared group identity.[49] (DOI 10127.)

The physical features of the Kennewick Man appear to be dissimilar to all modern American Indians, including the Tribal Claimants. DOI 10067–68. That does not preclude the possibility of a relationship between the two. However, absent a satisfactory explanation for those differences, it does make such a relationship less likely, and suggests that the Kennewick Man might have been part of a group that did not survive or whose remaining members were integrated into another group. The Secretary acknowledged the morphological incongruities, DOI 10015, 10067–69, without addressing this critical issue in depth, stating only that it "may indicate a cultural discontinuity ... or may indicate that the cultural group associated with the Kennewick Man may have subsequently intermixed with other groups migrating into or through the region...." DOI 10015.

**49.** At oral argument, the government theorized that because the projectile is a "Cascade" point, and the wound is believed to have occurred 20 or 30 years before the Kennewick Man died, he must have resided in this location most of his life. (June 19 Tr. at 63–64). However, the Secretary cannot say where or how that wound was sustained. There also is some question whether it is a "Cascade" point. Defendants withheld from Plaintiffs critical data regarding the projectile point until after the administrative record closed, and then furnished that data only after this court ordered that it be disclosed. (Docket # 397.) Upon reviewing this data, Plaintiffs—who are generally recognized as possessing considerable expertise regarding many of the technical issues in this case— have questioned the Secretary's assumption that the object is a Cascade point. (June 19 Tr. at 114–15, June 20 Tr. at 319, 340–41.) The Secretary's lithic expert, Dr. Dagan, concluded that it was "a possible or probable Cascade point," but was unable to give an unqualified opinion because the x-rays and CT scan images he reviewed lacked sufficient detail, and he was not permitted to remove the point for examination. DOI 10811. *See also,* DOI 10666 (characteristics observed "are not exclusive to Cascade points").

NAGPRA was intended to reunite tribes with remains or cultural items whose affiliation was known, or could be reasonably ascertained. At best, we can only speculate as to the possible group affiliation of the Kennewick Man, whether his group even survived for very long after his death, and whether that group is related to any of the Tribal Claimants.

From this record, the Secretary could not reasonably have found, by a preponderance of the evidence, that the Kennewick Man was associated with a particular "identifiable earlier group".[50]

### c. Shared Group Identity

As a threshold matter, without proof of a link between Kennewick Man and an "identifiable earlier group," there is no reasoned starting point from which to evaluate whether a shared group identity exists between the present-day Tribal Claimants and a particular earlier group. Perhaps that is why the Secretary focused on showing that ancestors of the Tribal Claimants could have resided in this region 9,000 years ago. This approach gave only cursory consideration to the statutory requirement that "shared group identity" be established, and impermissibly shifted the burden of proof from the Tribal Claim-

ants. Even if the Secretary had properly identified an "identifiable earlier group," the requirement of "shared group identity" must also be met.

### 1. Definition of Shared Group Identity

Proof of a "relationship of shared group identity which can be reasonably traced historically or prehistorically between a present day Indian tribe ... and an identifiable earlier group" is an essential element of a cultural affiliation claim under NAGPRA. 25 USC § 3001(2). NAGPRA does not define the phrase "relationship of shared group identity," and the Secretary makes no attempt to define this term in his decision letter.

The Secretary's regulations offer limited guidance, stating only that "[e]vidence to support this requirement must establish that a present-day Indian tribe ... has been identified from prehistoric or historic times to the present as descending from the earlier group." 43 CFR § 10.14(c)(3). Though the regulations do not explain what is meant by "descending from the earlier group," they clearly infer that the group has remained relatively intact through the years.

The statutory language also implies that the members must perceive themselves as

---

**50.** Defendants and the Tribal Claimants argue that the agency is entitled "to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh*, 490 U.S. at 378, 109 S.Ct. 1851. However, none of the four experts retained by the Secretary purports to identify the specific earlier group of which the Kennewick Man was a member, or to demonstrate that he was, in fact, part of that group. In any event, such an opinion would not be "reasonable" given how little we know about this person and the era in which he lived. For instance, Dr. Ames was asked to identify an "earlier group" with which the Kennewick Man *could* be associated, which was "defined chronologically .. as the archaeological manifestations contemporary with the skeleton's

age." DOI 10107. Ames never claims to have identified the Kennewick Man's actual group. Instead, he summarizes the predominant archaeological phases of that era, and draws some possible inferences regarding the lifestyle of the people who created those artifacts, and then examines the subsequent archaeological record in search of continuities and discontinuities. Though Dr. Hunn concluded that ancestors of the present-day Tribal Claimants have lived in this region for a long time, DOI 10326, that is very different from stating that the Kennewick Man, specifically, was a member of a particular group. Hunn does speculate that the Kennewick Man may have spoken a Proto–Penutian language, but the Secretary properly declined to endorse that theory. DOI 10069–70.

part of a group and function as such. There must be at least *some* common elements of language, religion, customs, traditions, morals, arts, cuisine, and other cultural features; a common perspective on the world and the group's role within it; and shared experiences that are part of the group's perception of its history. *See, e.g.,* DOI 3021–24, 7512, 8992, 9031–33, 10309. This commonality distinguishes the group and its members from other groups, and legitimizes the present-day group's authority to represent the interests of deceased members. *See,* S Rep No 101–473 9, DOI 0581, ("The requirement of continuity between present day Indian tribes and material from historic or prehistoric Indian tribes is intended to ensure that the claimant has a reasonable connection with the materials"). Retention of group identity over time also requires transmission of "that complex whole which includes knowledge, belief, art, morals, law, custom, and any other capabilities and habits acquired by man as a member of society" along with adaptations to the group's habitat and its means of subsistence to succeeding generations. DOI 10309.

### 2. The Expert Reports

As part of the process of evaluating the cultural affiliation claims, the Secretary retained four experts to produce reports on specific topics. Their work is summarized below.

#### a. Bio–Archaeological Data and Mortuary Practices

Dr. Steven Hackenberger [51] summarized studies concerning bio-archaeological data and mortuary practices in the region. His report indicates that little is known about either the physical characteristics of the inhabitants, or their mortuary practices,

before 5,000 years ago. DOI 10015, 10067, 10336–38.

For the period before 3,000 years ago, no consistent pattern of mortuary practices has been observed. *See, e.g.,* DOI 10067 ("major temporal gaps in Plateau human burial patterns between 7000 and 3000 years ago").[52] Some remains were burned and fragmented while others were buried. Dogs were interred in human graves in some locations, and at some sites partly cremated remains were covered by rock cairns. DOI 10336–38, 10498–500.

The Secretary concluded that the evidence regarding historical mortuary patterns is "too limited to draw any conclusions." DOI 10015. However, the wide range of practices observed, even based upon a limited sample, casts doubt upon the Secretary's larger implied assumption that this entire region encompassed a stable, monolithic culture (*i.e.,* a single "identifiable earlier group") for the past 9,000 years.

Though limited, the osteological data likewise suggests considerable variation among populations in the region. The perceived cranial and dentition characteristics of remains thought to be 9,000 to 11,000 years old found in and near the Marmes Rock Shelter appear to differ from the Kennewick Man, but the remains may be too incomplete and in too poor condition to draw many inferences. DOI 10336–38, 10442–50.

Only a small number of other human remains believed to be more than 3,000 years old have been found in this general region, mostly in Idaho and British Columbia. These include the "Buhl woman" (Idaho) and "Gore Creek man" (British

---

51. For simplicity, I refer to each of the four expert reports by the name of the lead author, while recognizing that others made important contributions to those reports.

52. *See also,* DOI 10015 ("very little evidence of burial patterns during the 9500–8500 period and significant temporal gaps exist in the mortuary record for other periods"); DOI 10336–38.

Columbia), both of whom were repatriated and reburied,[53] though some data was preserved. DOI 10336–37. The Gore Creek remains did not include a skull, so cranial and dental comparisons could not be made. DOI 10428. Carbon isotope studies on that skeleton suggested a diet largely composed of terrestrial plants and animals, whereas a similar test on the Kennewick remains suggested a diet very high in marine resources. DOI 10337. There are conflicting opinions regarding the morphology of the Buhl woman. *Cf.*, DOI 3194, 10354, 10432–33, 10456 (exhibits characteristic mongoloid morphology) and DOI 6179, 10354, 10441 (not mongoloid, and unlike any present-day Indian population).

Hackenberger also reports that a skull—possibly resembling that of the Kennewick Man, and perhaps between 8,000 and 9,000 years old—was found during a recent NAGPRA inventory of remains held by Central Washington University. DOI 10355. Initial reports indicated that the skull was found somewhere in eastern Washington, but details were still scarce when Hackenberger wrote his report. *Id.*

The bio-archeological data and evidence concerning mortuary practices included in the administrative record do not support the conclusion that cultural affiliation is established by a preponderance of the evidence. As noted above, the wide range of mortuary practices casts doubt on the Secretary's implied assumption that a monolithic, stable culture existed during the relevant period. Osteological data suggests

significant variations among populations in the region.

**b. Archaeological Record**

Dr. Kenneth Ames reviewed and summarized the archaeological[54] record, with emphasis on possible continuities and discontinuities over time in the people who inhabited the area where the Kennewick man was found. In his report, which relies primarily on published studies, DOI 10107–12, Dr. Ames concludes that "the empirical gaps in the record preclude establishing cultural continuities or discontinuities, particularly before about 5000 B.C." DOI 10171. Dr. Ames found that "[t]he major changes that occurred after 4000 B.C. also make it exceedingly difficult to trace connections forward in time." *Id.* Dr. Ames noted that, though there was overwhelming evidence that many aspects of the "Plateau Pattern" were present between 1000 B.C. and A.D. 1, "the empirical record precludes establishing cultural continuities or discontinuities across increasingly remote periods." *Id.* He added that, if the evidence that was available could not be used to show continuity, it likewise could not be used to demonstrate discontinuity. *Id.* In other words, the available evidence is insufficient to either prove or disprove cultural or group continuity dating back 9,000 years.

Dr. Ames' report identifies a number of significant gaps or discontinuities in the known archaeological record. Portions of the Columbia Plateau, including the Central Columbia Basin, may have been abandoned for thousands of years, given that "extensive survey has failed to uncover sites dating to this period." DOI 10058–59.[55] There is also evidence that major

53. Neither repatriation was pursuant to NAGPRA.

54. The term is used broadly here, and includes, among other things, artifact types, styles and manufacturing techniques, regional settlement patterns, economic and subsistence patterns, dwelling styles, and manufac-

ture, trade, and other social networks. DOI 10104–05.

55. *See also*, DOI 10131 ("the central Basin appears to have been virtually unused for a few millennia"); DOI 10137 (during the Windust and Cascade periods, "there is little evidence for human use of the central Columbia Basin ... [which] includes the general region

cultural changes occurred in the Columbia Plateau around 6,000 years ago, and again between 3,000 and 3,500 years ago. DOI 10059–60, 10153, 10172, 10242, 10245–46. Though it is insufficient to support any firm conclusions, evidence also suggests a "pause in land use" between 3200 and 2000 BC in central and northeastern Oregon. DOI 10148. There is also evidence that changes, some of which were quite substantial, occurred in settlement, housing, diet, trade, subsistence patterns, technology, projectile point styles, raw materials, and mortuary rituals at various times between the estimated date when the Kennewick man lived and the beginning of the "Plateau Culture" some 2,000 to 3,000 years ago. DOI 10059–67, 10153, 10172.

Leonhardy and Rice, who constructed the most commonly used chronology of the region and named the phases (*e.g.* Windust, Cascade), "thought that the varied point forms found in the late Cascade represented different cultural traditions." DOI 10062. They also assumed a cultural discontinuity between the Cascade and Tucannon phases, because "compared to both earlier and later phases, the technology of the Tucannon Phase seems crude and impoverished." DOI 9081–82. Cressman

also perceived a "cultural discontinuity represented by a clear shift in projectile point technological style." DOI 10062.

Though they bear the burden of establishing their claim to the remains, the Tribal Claimants are not required to prove an unbroken "chain of custody" or kinship in order to establish cultural affiliation with the Kennewick Man, and the existence of some "reasonable gaps" in the record will not automatically bar their claim. *See,* S Rep No 101–473 at 9 DOI 0581; 43 CFR § 10.14(d). However, the significant unexplained gaps and discontinuities in the archaeological record before the DOI make it impossible to assume continuity of group identity between the present occupants and any group that existed 9,000 years ago. Without evidence satisfactorily explaining the significant gaps in the archeological record, it is simply impossible to find that cultural affiliation has been established by a preponderance of the evidence.

### c. Linguistics

Dr. Eugene Hunn prepared a report discussing the linguistic evidence. In Hunn's opinion, the linguistic evidence suggests that the ancestors of the Sahaptin—speaking Tribal Claimants—who are a subset of the Tribal Claimants [56]—have

---

in which the Kennewick Man was found"); DOI 10149 (little evidence for use of central Columbia Basin between 9500 BC and 4000 BC); DOI 10137 (it "is not until the beginning of period II (4500–1500 BC) that projectile points and other materials are found away from rivers, and these in only small numbers until c. AD1"). There is also evidence that sites in other parts of the Plateau went unused for long periods of time. *See,* DOI 6917 ("Following the [Mazama ash fall dated to 6730 BP], there is about a 2,000 year hiatus between dated samples (4250+–300 B.P.) and then another 2,000 year hiatus between dated samples before six additional samples span the period between 1940+-B.P. and 660+–75 B.P.") (citation omitted).

**56.** Several of the claimant tribes were formed in the 19th century by aggregating previously

separate groups, even if they spoke different languages. Thus, the "Indians who were subsumed into the Yakima Nation spoke three different languages, Sahaptin, Salish and Chinookan and had many dialects within the two principal language groups." *United States v. Washington,* 384 F.Supp. 312, 381 (W.D.Wash.1974). *See also,* DOI 0708. Many of the groups on the Colville Reservation speak Interior Salish. DOI 0706–08, 5042. "The Sahaptin and Salishan linguistic stocks are mutually unintelligible." DOI 7414–15. The language of the Palus is reportedly very different from either the Nez Perce or the Cayuse (a component of the Umatilla confederation). *Id. But cf.,* DOI 7338 (arguing that their languages were very similar). The language of the Nez Perce is thought to have diverged from Sahaptin 2,000 years ago. DOI 10323. *See also,* http://www.umatil-

resided in this region for at least 2,000 years. DOI 10069, 10309–10, 10315–17, 10326. Hunn acknowledged that the linguistic evidence does not preclude the possibility of a shorter residency period, but considered that scenario unlikely. DOI 10317, 10326.

Hunn theorizes that "proto-Sahaptian or some immediate genetic predecessor was spoken throughout the Columbia Plateau approximately 4,000 years ago." DOI 10310, 10322.

Hunn also attempts to establish that an ancient precursor to these Sahaptin dialects, "proto-Penutian," was spoken on the Columbia Plateau at least 8,000–9,000 years ago, and that it "is more than likely that Kennewick Man spoke a proto-Penutian dialect." DOI 10310–11, 10323, 10326. Though he acknowledged it is possible that the Kennewick Man's group spoke another language, and that the ancestors of the Tribal Claimants "either displaced this earlier group or arrived after that group had moved elsewhere or had died out," Hunn saw "no evidence to suggest such an alternative." DOI 10326.

The Secretary accepted Hunn's conclusion that the ancestors of the Sahaptin-speaking peoples have likely resided in this region for at least 2,000 years, and perhaps for much longer. DOI 10015, 10069. However, the Secretary declined to endorse some of Hunn's other conclusions, noting that certain of the techniques

underlying those conclusions are "highly controversial" and "not widely accepted, even among linguists," and that attempting to determine what language was spoken on the Columbia Plateau beyond 2,000 to 4,000 years ago "is a difficult and questionable proposition." DOI 10015, 10069–70.[57]

The Secretary's determination that linguistics could not establish cultural affiliation in this case was appropriate. Given the limited information available regarding the Kennewick Man and his era, linguistics cannot tell us what language the Kennewick Man spoke, what group he was personally affiliated with, who else was in the region, or whether the Tribal Claimants are related to the Kennewick Man's group.

### d. Oral Histories and Traditions

Dr. Daniel Boxberger reviewed the oral histories and traditions of the Tribal Claimants. DOI 10265–10299. Though he acknowledged that attempting to use oral traditions to create a time line or establish particular dates "does not meet with much success," Boxberger opined that these traditions supported several conclusions. Without identifying what he meant by the phrase, Boxberger opined that the Tribal Claimants are the "heirs of succession to the area" where the remains of the Kennewick Man were found. DOI 10298. Boxberger noted there was no evidence of "inmigration causing cultural transformation," and concluded that, when used in

---

la.nsn.us/hist1.html (Umatilla Reservation web site) ("each tribe [that is part of the present Confederated Tribes of the Umatilla Reservation] spoke a distinct and separate dialect of Sahaptin"); DOI 10323 (at least 15 dialects of Sahaptin language family recognized)

**57.** *See also*, DOI 7041, 7229–30 (critique of Hunn's more controversial assumptions); DOI 812 (questioning method on which Hunn relies in part); DOI 816 (attempting to draw conclusions from the languages spoken during the historic period can be very mislead-

ing, because many languages may have come and gone during the preceding thousands of years; what remains are only the survivors); DOI 9002 (affidavit from linguistics professor, submitted by Plaintiffs, stating that "I am not aware of a single instance in which linguistic affiliation has been established with any degree of confidence between a modern population and human remains as old as the Kennewick skeleton"); DOI 10072 ("It is impossible to provide an absolute date for such a people's entrance into or continued occupation of a specific geographic area using these forms of linguistic information.")

conjunction with protohistoric, ethnographic, and historic databases, oral traditions "suggest a cultural continuity in the southern Plateau extending into the prehistoric past."[58] *Id.* He stated that, though they could not be dated with precision, oral traditions relating to geological events that occurred in the distant past are "highly suggestive of long-term establishment of the present-day tribes." *Id.* Boxberger added that ethnographic and historic data placed the Tribal Claimants in the area, and that oral traditions placed them there "since the beginning of time." DOI 10299.

In his review of the evidence concerning cultural affiliation, the Secretary in turn concluded that "collected oral tradition evidence suggests a continuity between the cultural group represented by the Kennewick human remains and the modern-day claimant Indian tribes." DOI 10015. The Secretary added that "oral tradition evidence reveals that the claimant Indian tribes possess similar traditional histories that relate to the Columbia Plateau's past landscape," and that the oral tradition evidence lacked any reference to migration into or out of that area. *Id.*

■ Before addressing whether oral traditions support the Secretary's cultural affiliation determination, I must briefly address Plaintiffs' contention that the narratives in question cannot be used as evidence. Plaintiffs assert that, because oral narratives are intertwined with spiritual beliefs, the Secretary's consideration of them violates the Establishment Clause of the First Amendment.

This argument fails. The Establishment Clause provides that "Congress shall make no law respecting an establishment of reli-

gion...." As a general rule, government conduct does not violate this provision if it (1) has a secular purpose, (2) does not have as its principal or primary effect advancing or inhibiting religion, and (3) does not foster an excessive government entanglement with religion. *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *American Family Ass'n, Inc. v. City and County of San Francisco,* 277 F.3d 1114, 1121 (9th Cir. 2002), *petition for cert. filed,* 71 USLW 3129 (July 29, 2002). The Establishment Clause might have been violated here if the Secretary had assumed that the narratives were true *because* they are religious in nature. However, the Secretary did not do so, but instead used the narratives for purely secular purposes.

Narratives can provide information regarding the history of Indian cultures, and Congress clearly intended that, where appropriate, this evidence should be considered in establishing cultural affiliation.[59] *See,* 25 USC § 3005(a)(4). However, reliance upon oral narratives under the circumstances presented here is highly problematic. If the Tribal Claimants' narratives are as old as the claimants contend, they would have been orally conveyed through hundreds of intermediaries over thousands of years. For ancient events, we cannot know who first told a narrative, or the circumstances, or the identity of the intervening links in the chain, or whether the narrative has been altered, intentionally or otherwise, over time. The opportunity for error increases when information is relayed through multiple persons over time. Intervening changes in language may alter meanings,

---

**58.** In the context of the Plateau, "historic" refers to events after 1805 AD; "protohistoric" refers to the period between about 1720 AD and 1805 AD, and the "prehistoric past" refers to the time before 1720 AD. DOI 10279–82.

**59.** The court has reviewed the numerous narratives included in the administrative record, and this Opinion refers to a few representative examples.

as might the process of translation into other languages.[60] Other considerations affecting reliability of the narratives include the expertise of the source of the narrative and the circumstances under which the particular narrative was traditionally transmitted. *See,* DOI 7658 ("Each legend or 'story' has a specific place or time to be told"); DOI 8989–92 (method of telling story may affect reliability).

Some of the narratives cited in the record show signs of having been adapted to reflect recent events or perhaps the experiences of the person transcribing or translating the narrative.[61] Other narratives

may have been influenced by political considerations or biases.[62] The narratives might furnish important insights into the people who originated and conveyed the narratives, and the Secretary could properly consider them for that purpose. However, their adaptability and political utility suggest that narratives are of limited reliability in attempting to determine truly ancient events.

Boxberger reviewed a number of narratives addressing geological events, such as the change in the flow of the Columbia River from the Grand Coulee. He opined that a narrative which states that in the old days the Columbia River flowed down

**60.** In addition to the report by Boxberger, the record contains a number of affidavits and articles on the evaluation of oral narratives. *See, e.g.,* DOI 8147–70, 8985–93.

**61.** Thus, one narrative begins, "In the days of the animal people, the Columbia River used to flow through the Grand Coulee. Coyote had a big steamboat then." DOI 6946. It proceeds to describe how Coyote cut a hole through the place where Coulee Dam is now, which caused the river to leave its old channel and flow through its present one. Coyote's steamboat was left in the dry channel. Jack Rabbit laughed at Coyote, and was turned into a rock. "You can see him sitting there today, at the left of Steamboat Rock...." (*Id.*) Although this narrative has obviously been adapted, other narratives also speak of a time when the Columbia River flowed down the Grand Coulee instead of its present channel. DOI·10292. That event may have been the subject of the original narrative.

**62.** In one version of the monster story, Coyote carved up the body of the monster and created the tribes, designating where they were to live and what they were to be:

From the body he made the people who live along the shores of the Big River and the streams that flow into it. From the lower part of the body he made the Chinook Indians of the coast. Clark quotes Coyote: "You shall live near the mouth of the Big River and shall be traders. You shall always be short and fat and have weak legs."

From the legs he made the Klickitat Indians. Again Coyote spoke: "You shall live along the rivers that flow down from the big white mountain north of Big River. You shall be swift of foot and keen of wit, famous runners and great horsemen."
From the arms he made the Cayuse Indians, and Coyote said: "You shall live along the Big River. You shall be powerful with bow and arrows and with war clubs."
From the ribs he made the Yakima Indians. Coyote declared: "You shall live near the new Yakima River, east of the mountains. You shall be the helpers and the protectors of all the poor people."
From the head he created the Nez Perce Indians. Coyote decreed: "You shall live in the bellies of the Kookooskia and Wallowa rivers. You shall be men of brains, great in council and in speechmaking. You shall also be skillful horsemen and brave warriors."
Then he gathered up the hair, blood and waste and hurled them far eastward over the big mountains, Coyote decreed: " 'You shall be the Snake River Indians. You shall be people of blood and violence. You shall be buffalo hunters and shall wander far and wide.' "
DOI 7660 (citations omitted).
From this narrative, it is not difficult to discern which groups had amicable relations with each other and which were enemies. However, although there are multiple versions of this narrative, the underlying story of Coyote and the Monster is present in all.

the Grand Coulee instead of its present channel "tells the listener where and how long ago an event occurred. It connects it to an event that occurred over 10,000 years ago when geologists tell us the Columbia River did flow through Grand Coulee." DOI 10292.

This conclusion assumes too much. The origins of the narrative are unknown, and the narrative does not establish a link between the Tribal Claimants and anyone who may have witnessed the Columbia River in the Grand Coulee or a change in the channel. Someone may have simply deduced what happened by observing the physical evidence, or the ancestors of the Tribal Claimants might have arrived on the Columbia Plateau a "mere" 4,000 years ago and learned of the event from people whose ancestors had actually witnessed it, or in turn had heard of it from an even earlier group. No shared group identity between the present-day Tribal Claimants and the people who may have been in the area more than 10,000 years ago can be established through such narratives.

Two of the Secretary's experts also suggest that various narratives about taking refuge on mountain tops when the earth flooded and similar stories may show that the Tribal Claimants' ancestors were here during the enormous floods that periodically devastated this region between about 12,800 and 15,000 years ago. DOI 5817, 7627, 7662–65, 8174, 9431–32, 10056, 10076, 10292, 10324–25. However, it is unclear whether people actually resided in the region at that time, or if they did, whether they survived the massive floods, which are believed to have produced a wall of water up to 1,000 feet high and dramatically altered the landscape of eastern Washington and northwestern Oregon. *See, e.g.,* DOI 9431 (describing floods).

Even if someone did witness and survive such a flood, it does not necessarily follow that the ancestors of the Tribal Claimants were present. In addition, the legend of a great flood is a common theme of global mythology, DOI 7229, 7664, 10325, and the Secretary noted that the area that has been occupied by the Tribal Claimants has been subjected to large floods during the past 5,000 years, and has been regularly subjected to floods more recently. DOI 10074–76. These more recent events could account for stories about a great flood. DOI 10074. Similarly, narratives thought to be based upon an eruption of Mt. Hood could be based upon an eruption that occurred 15,000 years ago, 1,800 years ago, or only 200 years ago. DOI 7665, 10292. Narratives describing a battle between "Warmweather and Coldweather," DOI 10289, could refer, as Boxberger suggests, to the end of the great ice age, or to climate changes that have occurred more recently in the region. *See, e.g.,* DOI 10056–57. There is no way to know.

The significance that the Secretary and Boxberger attribute to the absence of a "migration tradition" among the Tribal Claimants and the oral traditions placing these tribes in their present location since the beginning of time is also misplaced. As the Secretary noted, "[o]rigin stories without migration are not always affirmed by investigations using other independent data." DOI 10074. Even if it is correct, the Secretary's observation that these aspects of the Tribal Claimants' narratives "may suggest that the ancestors of the present-day tribes have lived in the region a very long time" tells us little. In human terms, even two or three thousand years is a very long time: A much longer interval exists between the present and the lifetime of the Kennewick Man.

In sum, though narratives can provide information relevant to a cultural affiliation determination in appropriate circumstances, the narratives cited in the record here do not provide a substantial basis for

concluding that the Tribal Claimants have established a cultural affiliation between themselves and an earlier group of which the Kennewick Man was a member. If, as Boxberger opines, the oral traditions help to establish a "cultural continuity ... extending into the prehistoric past," the narratives do not help to establish how far into the "prehistoric past" such continuity extends. The 9,000 years between the life of the Kennewick Man and the present is an extraordinary length of time to bridge with evidence of oral traditions.

Even if they could be relied upon to establish that the ancestors of the Tribal Claimants have resided in this region for more than 9,000 years, the narratives cited by the Secretary do not establish a relationship of shared group identity between those ancestors and the Kennewick Man's unidentified group.

### e. Conclusion

The Secretary did not articulate a cogent rationale that supports his finding of cultural affiliation. The Secretary neither identified the earlier group to which the Kennewick Man belonged, nor explained how he inferred a "shared group identity" over a span of 9,000 years between the Tribal Claimants and this unknown earlier group. The Secretary did not explain why he believes the Kennewick Man is related to the Tribal Claimants, even though the remains appear to be morphologically dissimilar from all modern American Indians, including the Tribal Claimants. Instead, the Secretary offered only this cryptic explanation for his conclusion:

> While some gaps regarding continuity are present ... the geographic and oral tradition evidence establishes a reason-

able link between these remains and the present-day Indian tribe claimants. DOI 10015.

The Secretary did not explain what he means by the "geographic" evidence, or offer any examples. If the Secretary meant that the Tribal Claimants have strong ties to the Columbia Plateau, and the Kennewick Man lived there 9,000 years ago, that is insufficient to satisfy the statutory requirement. If the Secretary was referring to the topics covered in Dr. Ames' report, that report was inconclusive. As for oral traditions, the Secretary's discussion of this evidence indicated only that the Tribal Claimants "possess similar traditional histories that relate to the Columbia Plateau's past landscape" and that these traditions "lack[ ] any reference to a migration of people into or out of the Columbia plateau." DOI 10015. The Secretary does not explain how those facts lead to his ultimate conclusion. Similarly, the Secretary's brief states only:

> [T]aking into account the tribal claimants' oral history that they had always inhabited this area, as well as the absence of any migration stories, and all of the other relevant evidence, the Secretary determined that there was a shared group identity between the earlier group and the present day claimants.

Defendants' Brief at 16. *See also, id.* at 17, n. 16 (citing oral traditions as the justification for the decision).[63] The Secretary provides little explanation of how this "other relevant evidence" reasonably supports his conclusions.

"In order for an agency decision to be upheld under the arbitrary and capricious

---

63. The Secretary's brief also states that his decision was premised, in part, upon a finding "that the tribal claimants' oral traditions often corresponded to known ancient geological events that occurred in the Plateau region." Defendants' Brief at 17–18, n 16. In

actuality, the Secretary declined to make such a finding, noting that floods and volcanic eruptions have occurred on many occasions in the region, and we cannot assume a narrative depicts a specific geological event that occurred 10,000 years ago. DOI 10072–76.

standard, a court must find that evidence before the agency provided a rational and ample basis for its decision." *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1462 (9th Cir.1996); *Northwest Motorcycle Ass'n*, 18 F.3d at 1471. "After considering the relevant data, the agency must articulate a satisfactory explanation for its action including *a rational connection between the facts found and the choice made.*" *Id.* (emphasis added, citations and internal punctuation omitted).

The Secretary's decision does not meet this standard. The present record does not provide a sufficient basis from which the Secretary could identify the "earlier group," or show that the Kennewick Man was likely part of that group, and establish by a preponderance of the evidence a relationship of shared group identity between the present-day Tribal Claimants and that earlier group. The Secretary has not articulated an adequate rationale for such conclusions. Consequently, even if the Secretary's conclusion that the remains are "Native American" had been correct, the decision to award these remains to the Tribal Claimants could not stand.

The Tribal Claimants argue that, under NAGPRA, the remains must be awarded to the claimant with the "closest cultural affiliation"—no matter how attenuated that relationship—if no other tribe has filed a claim or established that it has a closer affiliation. *See, e.g.,* (June 20 Tr. at 226–28, 237–39); Tribal Claimants' Brief at 24–25. A careful reading of the statute does not support this interpretation. Read in context, the reference in § 3002(a)(2)(B) to the tribe that has the "closest cultural affiliation" is implicitly qualified by the requirement that the claimant must first satisfy the cultural affiliation standard. §§ 3002(2), 3005(a). The term "closest" is implicated only if there are multiple claimants, each of which successfully establishes the requisite degree of cultural affiliation.

NAGPRA does not mandate that every set of remains be awarded to *some* tribe, regardless of how attenuated the relationship may be. On the contrary, the Act expressly contemplates instances in which no claimant can establish the requisite degree of cultural affiliation to be entitled to claim the remains. *See,* §§ 3002(a)(2)(C) and 3002(b). The Tribal Claimants' reading of the statute would eliminate the requirement that a claimant establish, by a preponderance of the evidence, a shared group identity with the identifiable earlier group.

Based on a thorough review of the record, I conclude that the evidence before the Secretary was insufficient to establish cultural affiliation by a preponderance of the evidence. The Secretary's finding that the Tribal Claimants have satisfied the cultural affiliation requirement of 25 USC § 3001(2) is arbitrary and capricious, and must be set aside.

### 3. Aboriginal Lands

■■■ As an alternative basis for the decision awarding the remains to the Tribal Claimants, the Secretary declared that "a claim based on aboriginal occupation, 25 USC [§ ] 3002(a)(2)(C)(1), was also a basis for the disposition of the Kennewick remains to the claimant Indian tribes in this case." DOI 10016. I disagree with the Secretary's assertion that this section provides a legitimate basis for disposition under the circumstances here.

Under 25 USC § 3002(a)(2)(C), the "ownership or control" of Native American cultural items (including human remains) excavated or discovered on Federal or tribal lands after November 16, 1990, is determined, in relevant part, as follows:

[I]f the cultural affiliation of the objects cannot be reasonably ascertained and if the objects were discovered on Federal land that is recognized by a final judgment of the Indian Claims Commission or the United States Court of Claims as

the aboriginal land of some Indian tribe—

> (1) in the Indian tribe that is recognized as aboriginally occupying the area in which the objects were discovered. . . .

When the Corps decided to give the remains to the Tribal Claimants in September 1996, it cited this section as one basis for that decision. COE 4805–AA, 9275. *See also*, DOI 1417–19. However, on January 24, 1997, the Corps informed Plaintiffs it had determined that the site where the remains were found "was not the subject of a final judgment of the ICC as originally believed." DOI 1598. In a response to Plaintiffs' Request for Admissions dated February 5, 1997, Defendants acknowledged that:

> To the best of current knowledge and belief, the lands upon which the human remains were discovered are not on lands that are recognized by a final judgment of the Indian Claims Commission (ICC) or the United States Court of Federal Claims as the aboriginal land of some Indian tribe.

COE 8244. Defendants have never sought leave to withdraw or amend that admission.

On July 1, 1998, Defendants formally notified the court that:

> [T]he Department of the Interior ("DOI") has determined that the site of discovery does not fall within any area recognized as the aboriginal land of any Indian Tribe in a final judgment of the Indian Claims Commission or the United States Court of Federal Claims. . . . The determination was made at this time solely to streamline the possible decision-making process and to clarify this issue since it had been raised in the initial federal register notice issued by

the Corps shortly after the remains were discovered.

DOI 3174. Thereafter, in the numerous status reports and briefs filed with the court, Defendants never indicated that the "aboriginal lands" issue was under active consideration. On the contrary, in a report dated October 1999, Dr. Francis McManamon—who was leading the Secretary's efforts regarding the Kennewick man—unequivocally stated:

> A careful legal analysis of the judicial decisions by the Indian Land Claims Commission and the Court of Claims shows that the land where the remains were discovered has not been judicially determined to be the exclusive aboriginal territory of any modern Indian tribe. This means that Section 3(a)(2)(C) of NAGPRA (25 U.S.C. 3002(a)(2)(C)) that permits disposition of Native American remains recovered from federal lands that have been subject to such a decision does not apply in this case. It is recognized by many, including the tribes, that the area around Kennewick was used heavily by many tribes and bands, so much so that the Commission found that no single tribe had a claim to exclusive use or occupancy.

DOI 10660.

In keeping with Defendants' admissions, the joint claim to the remains filed by the coalition of Tribal Claimants expressly states that it is a "cultural affiliation claim" made pursuant to 25 USC § 3002(a)(2)(B). DOI 4110. It does not cite or assert a claim under § 3002(a)(2)(C). (*Id.*)

Given this consistent reiteration that § 3002(a)(2)(C) did not apply, the Secretary's subsequent reliance on this statute as an independent basis for the decision to award the remains to the Tribal Claimants was surprising,[64] and deprived the Plain-

---

**64.** There are indications that the Tribal Claimants were secretly notified that this issue was "back on the table." On August 11,

2000, shortly before the Secretary announced the final decision and shortly after the Tribal

tiffs of the opportunity to submit materials or comments regarding this issue. However, even if the Secretary could properly take a contrary position without notice or leave to withdraw or amend the earlier admissions, his conclusion that "aboriginal occupation" provided an alternative basis for disposition to the Tribal Claimants was contrary to law. The Secretary concedes that the remains were not discovered on federal land that is recognized by a final judgment of the ICC or Court of Claims [65] as the aboriginal land of one of the Tribal Claimants. DOI 3174, 10016. The Solicitor's memorandum, upon which the Secretary relies, similarly acknowledges that:

> NAGPRA's text refers to a "final judgment" of the ICC that "recognize[s]" the land where human remains or other cultural items are recovered "as the aboriginal land of some Indian tribe." In the case of the Kennewick remains, *there is no such final judgment.*

COE 108 (emphasis added).

Though that should have been the end of the matter, the Secretary has chosen to treat the language of the statute as merely precatory, asserting that:

> The final judgments of the Indian Claims Commission (ICC) and the United States Court of Claims that encompass the Kennewick remains' recovery site and other judicially established Indian land areas have been extensively reviewed. For reasons explained in Enclosure 4, disposition under § 3002(a)(2)(C)(1) may not be precluded when an ICC final judgment did not specifically delineate aboriginal territory due to a voluntary settlement agree-

ment. If the ICC's findings of fact and opinions entered prior to the compromise settlement clearly identified an area as being the joint or exclusive aboriginal territory of a tribe, this evidence is sufficient to establish aboriginal territory for purposes of § 3002(a)(2)(C)(1). The Federal land where the Kennewick remains were found was the subject of several ICC cases brought by the Confederated Tribes of the Umatilla Reservation, a tribe composed of multiple Indian bands, in the 1950s and 1960s. These cases culminated in a final judgment in accordance with a compromise settlement. Although the compromise settlement did not delineate the aboriginal territory of the Umatilla, the ICC had previously determined in its opinion and findings of fact that several Indian tribes, including the Umatilla (Walla Walla and Cayuse) and Nez Perce, used and occupied this area were [sic] the Kennewick remains were found. (14 Ind. Cl. Comm. 14, (1964)). Because the Umatilla and Nez Perce, as well as the neighboring Yakama Tribe and Confederated Tribes of the Colville Reservation, have jointly filed a claim for custody of the remains under NAGPRA, DOI has determined that disposition to the claimant tribes is appropriate under 25 USC 3002(a)(2)(C)(1).

DOI 10016 (footnote omitted).

The Secretary's interpretation is contrary to the express terms of NAGPRA, which explicitly limit its applicability to situations in which the object in question was found on land that is *recognized by a final judgment* of the ICC or the Court of

---

Claimants met privately with Defendants to discuss the merits of their claim, the Yakama placed into the administrative record 170 pages of documents regarding the ICC issue. COE 2826–2995.

**65.** Pursuant to statute, the ICC ceased operations in 1978 and transferred its remaining

cases to the Court of Claims. *Arizona v. California,* 530 U.S. 392, 404 n. 1, 120 S.Ct. 2304, 2313 n. 1, 147 L.Ed.2d 374 (2000). The Court of Claims also heard appeals from the ICC. For simplicity, a judgment entered by either entity is referred to herein as an "ICC judgment."

Claims as aboriginal lands. Judicial deference to an agency's interpretation is inappropriate where, as here, the language of the statute is unambiguous. *See, Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress"). Even if the statute were ambiguous, the Secretary's interpretation would not be entitled to *Chevron* deference because it was not promulgated through notice and comment procedures, was announced for the first time four years into this litigation, and is not a permissible interpretation of the statute.

The interpretation is also contrary to the DOI's earlier position that § 3002(a)(2)(C) would not always be a sound basis to establish affinity to contemporary groups where it could not be otherwise established. In testimony to Congress regarding this issue in 1990, the Department of Interior stated:

> We believe it would not be proper to use aboriginal occupation as the sole criteria for establishing affinity where no affinity to contemporary groups can be established. In some cases this criterion will be reasonable, in other cases it will not. Therefore, we recommend section 3(a)(2)(C) be deleted.

S Rep No 101–877 at 31, 1990 USCCAN at 4390, DOI 0612.

The skepticism expressed in that testimony about relying on aboriginal title as the basis for determining ownership and control over cultural items is well-founded, and the statute should not be expanded beyond its plain meaning. The Indian Claims Commission was created, in part, to compensate Indian tribes whose lands had been acquired by the United States for inadequate value, and to quiet "Indian title" to those lands. Pub L 79–726, 60 Stat 1049, 1050, 1055; *United States v. Dann,* 470 U.S. 39, 45, 105 S.Ct. 1058, 84 L.Ed.2d 28 (1985); *Sioux Tribe of Indians v. United States,* 8 Cl Ct 80, 84–85 (1985). Given this narrow purpose, the ICC was primarily concerned with determining which tribe was occupying the land *at the time that land was acquired by the United States,* typically during the 19th century, and during the period immediately preceding the acquisition.[66]

Occupancy for as little as a few decades has been held sufficiently long to establish aboriginal title. *Alabama–Coushatta Tribe of Texas v. United States,* 28 Fed Cl 95 (1993), *and on appeal,* 2000 WL 1013532 (Fed.Cl. 2000) (exclusive occupancy for 30 years held sufficient to establish aboriginal title); *United States v. Seminole Indians of the State of Florida,* 180 Ct.Cl. 375, 387 (1967) (period of more than 50 years deemed "sufficient, as a matter of law, to satisfy the 'long time' requirement essential for Indian title").[67] In addition,

---

**66.** *Cf., Confederated Tribes of the Umatilla Reservation v. United States,* 8 Ind Cl Comm 513, 530–39 (1960), and 14 Ind Cl Comm 14, 15–103 (1964) reprinted at DOI 178–87, COE (2873–2916) (focusing upon which tribes occupied which areas near the time of the taking, not in the distant past).

**67.** Other authorities confirm that an ICC determination of aboriginal title does not necessarily mean that a tribe has occupied the land, to the exclusion of all others, for thousands of years:

> Indian title ... requires use of the area "for a long time." The decisions reflect an unwillingness to find ownership of a specified tract in a nomadic tribe wandering over many areas; some degree of continuous association with an area has been required. However, no example comes to mind of a tribe so nomadic that it was denied having Indian title lands located somewhere. Perhaps 20 to 50 years seems judicially acceptable as "a long time" under appropriate circumstances.

Indian Claims Commission Final Report at 129. COE 9800. *See also,* Cohen, Handbook

there are numerous exceptions to the general rule that a tribe must establish exclusive use and occupancy in order to secure aboriginal title. *Alabama–Coushatta Tribe v. U.S.,* 2000 WL 101352 at *12–13. Consequently, the fact that an ICC judgment designates a particular tribe as holding "aboriginal" title to the land does not necessarily mean the land was used only by that tribe, or that human remains found on the land are necessarily the remains of tribal members. As the Department of Interior testified before Congress, in some instances that assumption will be reasonable, and in other cases it will not be.

The Secretary erred in interpreting § 3002(a)(2)(C) in a manner that would apply it to situations not included within its plain language. Even if the Secretary's interpretation of the statute were legally correct, and reference to a "final judgment" of the ICC or the United States Court of Claims actually referred to something other than such a final judgment, I would still hold that the Secretary erred as a matter of law in concluding that the statute applies here. The Secretary relied on factual findings which were vacated as part of a settlement entered into while the underlying decision was on appeal. The settlement dismissed the appeal and expressly provided that it "shall not be intended by either party as an affirmance of the findings or decisions of the Indian Claims Commission, but otherwise shall be with prejudice." 16 Ind Cl Comm 484, 486 (1966), DOI 222. The settlement further provides that:

> This stipulation, dismissal of the appeal *and entry of the Final Judgment shall not be construed as an admission of either party as to any issue for purposes of precedent in any other case or otherwise.*

of Federal Indian Law at 492 (while the claimant must show a "substantial period of exclusive occupancy," the fact "that the occu-

16 Ind Cl Comm at 487; DOI 223 (emphasis added).

In finding that there is a valid final ICC judgment recognizing the discovery site as the aboriginal lands of one of the Tribal Claimants, the Secretary ignores that language and another crucial fact: the ICC did *not* find that any of the tribal claimants have aboriginal title to the discovery site. On the contrary, the ICC found that this location—near the confluence of three major rivers—was used in common by many Indian groups, and that none of the claimants held aboriginal title.

> [T]he Commission finds that the evidence is insufficient to establish exclusive use and possession for a long time, or from time immemorial, in any of the three tribes comprising the Confederated Tribes of the Umatilla Indian Reservation at the critical times in this proceeding. There is substantial evidence to the contrary that the three Umatilla tribes, the Wayampam bands, the Nez Perce tribe, the Snake Indians, sometimes referred to as the Northern Pauites—an unidentifiable group of Indians—or the Shoshonean peoples, and other miscellaneous Indians have traveled, gathered, and hunted over said area and have taken fish from its streams; said use was in common with said tribes and bands. The Umatilla tribes and their allies jointly began a campaign of conquest in the 1820's against the Snake Indians, as above described, to acquire the disputed areas, which at said times and for a long period prior thereto were in the possession and use of said Snake Indians.
>
> We also find that the tribes attempting the said conquest and use met with determined resistance; that they did pene-

pancy commenced after discovery or after the assertion of territorial claims by European powers does not defeat the Indian title.")

trate some parts of the said areas but their progress was very slow, and the war between the rival groups continued unresolved at the date of the Umatilla Treaty with the United States and for a considerable period beyond said date. At no time within the period were the said Snake Indians entirely excluded from the claimed areas.

14 Ind Cl Comm 14, 102–03 (1964), COE 2915–16. *See also,* DOI 10086 (letter from Solicitor to the Secretary, acknowledging that the ICC had determined that the discovery site was used by the Umatilla, Cayuse, Walla Walla, Wayampam, Nez Perce, Snake Indians, "and other Indians" during the time relevant to the ICC's inquiry); DOI 1418 (letter from Umatilla to Corps, acknowledging that the ICC "determined that the [Umatilla] had failed to prove the exclusive use and occupation required for a determination of aboriginal ownership"); DOI 10660 (report by Dr. McManamon acknowledging that the ICC found that the area around the discovery site "was used heavily by many tribes and bands, so much so that the Commission found that no single tribe had a claim to exclusive use or occupancy"). Consequently, even if this ICC claim had not been settled, the factual findings would not have qualified as a determination of aboriginal occupancy for purposes of § 3002(a)(2)(C).

The Secretary also contends that, because some of the tribes that used the area are now members of the coalition of Tribal Claimants, the coalition is a proper claimant even if no tribe, in its own right, would be a proper claimant. The sole basis cited by the Secretary for this contention is some vague language in the preamble to the enabling regulations.

The Secretary misconstrued § 3002(a)(2)(C) to include cases in which no valid final judgment established aboriginal title, and misinterpreted the statute by applying it to cases in which the ICC had specifically found that the tribe *failed* to establish its aboriginal title. The statute cannot be construed in this manner. The Secretary's argument also demonstrates, once again, the problems potentially posed by recognition of coalition claims. The Secretary's determination that § 3002(a)(2)(C)(1) furnishes a valid alternative basis for awarding the Kennewick remains to the Tribal Claimants was arbitrary and capricious, contrary to law, in excess of the Secretary's authority, and tainted by procedural irregularities.

### 4. Constitutional Issue

As noted above, Plaintiffs assert that Defendants have violated their First Amendment "rights to freedom of speech and access to information" by refusing to allow them to study the remains of the Kennewick Man and the site where the remains were found. In an earlier decision remanding this action, I did not decide whether scholars have a First Amendment right of access to primary research materials in the government's possession, or the extent of such a right if it does exist. *Bonnichsen,* 969 F.Supp. at 648. The decision instructed the Corps to consider whether Plaintiffs have a First Amendment right to study. *Bonnichsen,* 969 F.Supp. at 646, 654. Because Defendants again concluded on statutory grounds that Plaintiffs were not entitled to study the remains, it was necessary to reach the constitutional issue on remand. Defendants again concluded that Plaintiffs do not have a right to study pursuant to the First Amendment.

If I had also decided that Plaintiffs were not entitled to study the remains on other grounds, it would be necessary to address Plaintiffs' constitutional claim now. However, courts avoid reaching constitutional questions unless it is necessary to do so. *E.g., New York Transit Authority v. Beaz-*

*er,* 440 U.S. 568, 582–83, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979); *Clark v. City of Lakewood,* 259 F.3d 996, 1016 n. 12 (9th Cir. 2001) ("courts should avoid making federal constitutional decisions unless and until necessary"). Because I have concluded that Plaintiffs are entitled to study on statutory grounds, I need not and do not decide the Constitutional question.

## III. OTHER CLAIMS

The decision that Plaintiffs must be allowed access to the remains for study, set out later in this Opinion, addresses the most significant issue in this litigation, and grants the most important of the various types of relief sought. The remaining, less significant issues are addressed briefly below.

### A. Curation Claim

Plaintiffs contend that the curation of the remains of the Kennewick Man violates the requirements of ARPA because Defendants have failed to develop a "long-term preservation plan" and have not assured that the remains are kept in appropriate conditions. Defendants assert that the curation conforms to the requirements of ARPA, and that actions to date involving the remains have not been the kind of "repeatable events" that would ordinarily be covered by a long-term preservation plan, but instead have been "unique." They contend that, under the present circumstances, "[i]t would have been foolhardy to develop a long-term preservation plan while the long-term conditions or status of the collection had not been identified and the events of intense handling were continuing to occur."

The record does not establish that Defendants' curation techniques have been deficient since the remains were transferred to the Burke Museum. According-

ly, no relief will be granted on this claim at this time. However, given this court's finding that ARPA applies, Defendants must curate the remains in conformance with that Act.

### B. The National Historic Preservation Act (NHPA) Claim

■ NHPA requires federal agencies to "take into account the effect" of any "undertaking" on any site included or eligible for inclusion in the National Register. 16 USC § 470f; 36 CFR § 800.1(c).[68] An "undertaking" is "any project, activity, or program that can result in changes in the character or use of historic properties." 36 CFR § 800.2(*o*).

Federal agencies are required to consult with "interested parties" before carrying out an "undertaking" that affects eligible property. 36 CFR § 800.1(c). "Interested parties" include "individuals that are concerned with the effects of an undertaking on historic properties." 36 CFR § 800.1(c)(2). Agencies are also required to assess whether an undertaking will adversely affect property that is subject to the Act, 36 CFR §§ 800.4(e), 800.5, 800.9, determine whether there will be any destruction, damage, or alteration of the property that will diminish certain qualities of the property, 36 CFR §§ 800.5(c), 800.9(b), and avoid or mitigate any adverse effects, 36 CFR §§ 800.5(e).

Plaintiffs allege that Defendants violated NHPA by failing to consult with them before burying the site where the remains of the Kennewick Man were found, failing to adequately assess whether burial of the site would detrimentally alter the site, and failing to avoid or mitigate adverse effects of the project. Plaintiffs contend that, though they were "interested parties," De-

---

**68.** The regulations cited are those in effect when the site was covered. The regulations were substantially modified in 1999. 64 Fed Reg 27,071 (May 18, 1999).

fendants largely ignored their assertions that the site was important to determining the status of the remains of the Kennewick Man pursuant to NAGPRA, and that Plaintiffs were not given an adequate opportunity to receive information and express their views about plans to cover the site. They also assert that Defendants ignored regulations requiring them to assess the contents of the site, including cultural components, and to mitigate the potential loss of important data from the site.

Defendants note that the relevant State Historic Preservation Officer (SHPO) and Advisory Council on Historic Preservation (ACHP) concurred with the Corps' conclusion that covering the site would have no "adverse effect" on that location. They contend that, as "interested" rather than "consulting" parties, Plaintiffs had limited rights, and that the Corps reviewed letters received from Plaintiffs' counsel concerning the project, and transmitted those letters to the SHPO. Defendants assert that they withheld the implementation of the site protection contract for some time to allow Plaintiffs the opportunity to seek injunctive relief, and contend that Plaintiffs should not have waited three years to raise objections concerning the Corps' compliance with NHPA.

The record supports the conclusion that Plaintiffs were not afforded the opportunity that is required under NHPA to present their views concerning the burial of the site, and that relevant information they provided was not considered before the decision to cover the site had already been made. There is no evidence in the record that all of the letters setting out Plaintiffs' objections in detail were acknowledged or that letters from Plaintiffs' counsel were forwarded to the SHPO or the ACHP.

Instead, it appears that Plaintiffs' objections were not received by the SHPO and the ACHP until it was too late for their consideration. In addition, Plaintiffs were not told of the expanded project to cover the site until nearly two months after the decision to proceed with it had been made. Plaintiffs received information about that project on December 26, 1997, in response to a request for information they made on November 10, 1997, and were allowed only until December 29, 1997, to respond.[69] See, ER 306, SUP 614. The Corps did not delay its decision after Plaintiffs' counsel informed it that the letter had arrived too late to allow time for discussion with his clients. See, ER 302, SUP 596.

The record likewise does not support Defendants' contention that the Corps adequately considered the effects of the projects and how the damage to the archeological value of the site could be minimized. As noted in the Background section above, the Corps was primarily interested in burying the site before further study could be carried out, and it appears that protecting the archeological value of the site in a manner consistent with NHPA was not a major concern. A Corps scientist noted that the erosion at the site was "not as serious as that occurring at many other Corps of Engineers Reservoirs," and advised that "it would seem advisable to be cautious about long term deleterious effects of engineering site protection measures." SUP 432, ER 279. Nevertheless, the project proceeded without significant study to determine the characteristics of the site, including what archaeological resources might exist, and there is little evidence that alternative methods of erosions control that might mitigate poten-

---

69. Plaintiffs' counsel began seeking information about plans to cover the site as early as November 1996. See, ER 270.

tial data loss were seriously considered. *See*, ER 293, SUP 487, ER 370, ER 345–47.

In sum, I conclude that the Corps violated the NHPA requirements that the views of "interested parties" be considered, that potential loss of archaeological data be mitigated, and that the potentially negative effects of the project be fully and carefully considered. Though the Court will declare that NHPA was violated, no relief other than this declaration is appropriate at this time.

### C. Freedom of Information Act (FOIA) Claim

Plaintiffs' counsel submitted six FOIA requests seeking information that could be used during the administrative process. Though there is no question that Defendants failed to provide all of the material sought during that process, they now assert that Plaintiffs' FOIA claim is moot because all of the "non-privileged responsive documents" Plaintiffs have requested are included in the 22,000 page administrative record.

■ Under FOIA, courts have jurisdiction "to enjoin the agency from withholding agency records and to order the production of any agency records improperly held." 5 USC § 552(a)(4)(B). Such an order is the only remedy expressly authorized under FOIA. *E.g., Tax Analysts v. Internal Revenue Service*, 117 F.3d 607, 610 (D.C.Cir.1997). Therefore, a challenge to a denial of a FOIA request becomes moot when the material requested is produced. *E.g., Carter v. Veterans Admin.*, 780 F.2d 1479, 1481 (9th Cir.1986).

It appears that the material Plaintiffs sought in their FOIA request has been provided in the administrative record. Ac-cordingly, the substantive FOIA claim is moot, and the request for relief pursuant to that Act will be denied.

### IV. REMEDY AS TO DECISIONS ON REMAND

■ The court is well aware that, in actions involving judicial review of an agency's final administrative decision, the ordinary remedy when a decision is set aside is remand to the agency for further proceedings. *E.g. Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) ("If the record before the agency does not support the agency action ... the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").[70] However, in the usual case, the court is called upon to review the final decision of an apparently neutral and unbiased agency that has reached a final decision through a fair process. This is far from the usual case. Here, the record establishes that the agency was consistently biased, acted with obvious disregard for even the appearance of neutrality, and pre-determined the outcome of critical decisions, including the ultimate disposition of the remains. I have already remanded this action once, in an Opinion noting that the agency had failed to consider all the relevant factors, had acted before it had all of the evidence, had failed to fully consider legal questions, had assumed facts that proved to be erroneous, had failed to artic-ulate a satisfactory explanation for its action, had followed a "flawed" procedure, and had prematurely decided the issue before it. *Bonnichsen*, 969 F.Supp. at 645. Defendants' conduct since that initial re-mand (including burial of the site where the remains were recovered under the pre-

---

**70.** Here, such a remand would require Defendants to consider Plaintiffs' request to study in light of the court's determination that the

Secretary erred in concluding that NAGPRA applies.

text of "erosion control") provides no basis for concluding that, if this action were remanded yet again, Plaintiffs' request to study would be evaluated in a fair and appropriate manner.

Remand is not required in those unusual cases where the court cannot be confident of an agency's ability to decide a matter fairly. *See, e.g., Guerrero v. Stone,* 970 F.2d 626, 636 (9th Cir.1992) (court may substitute own judgment for that of agency and order "substantive relief sought" in appropriate circumstances); *Alvarado Community Hosp. v. Shalala,* 155 F.3d 1115, 1125 (9th Cir.1998), *amended,* 166 F.3d 950 (9th Cir.1999) (ordering relief rather than remand to avoid "further recondite litigation"); *Greene v. Babbitt,* 943 F.Supp. 1278, 1288 (W.D.Wash.1996) (court has no obligation to remand, may fashion equitable remedy, when it has no confidence in agency's ability to decide matter expeditiously and fairly). Because there is no reason to conclude that Defendants would fairly evaluate Plaintiffs' study request if this action were remanded for further consideration in light of the other decisions set out in this Opinion, I will consider the appropriate remedy.

Defendants denied Plaintiffs' repeated requests to study on the grounds that the remains of the Kennewick Man were subject to NAGPRA. For the reasons set out above, NAGPRA does not apply to the remains of the Kennewick Man. In determining the relief to which Plaintiffs are entitled based upon this conclusion, the relevant issues are therefore: the law that applies in the absence of NAGPRA, and the Corps' legal responsibility given that this Act does not apply.[71]

As noted in the Background section above, the remains were initially collected pursuant to a permit issued to Dr. Chatters under ARPA. "Human skeletal materials" constitute an "archaeological resource" subject to that Act if they (1) are discovered on federal land, (2) are more than 100 years old, and (3) are "capable of providing scientific or humanistic understanding of past human behavior, cultural adaptation, and related topics through the application of scientific or scholarly techniques...." 16 USC § 470bb; 43 CFR § 7.3(1)(a), (3)(vi). The remains of the Kennewick Man clearly satisfy these requirements, as Corps District Engineer Lt. Colonel Curtis, Jr. tacitly acknowledged when he cited ARPA as a source of federal jurisdiction over the remains. *E.g.,* Affid. of Alan Schneider, Exh.A, filed in support of Plaintiffs' motion for access to study.

ARPA provides for issuance of permits before archaeological resources are excavated and removed, and requires that objects be curated and preserved after excavation or removal. 16 USC § 470cc(b); 43 CFR § 7.8. The Secretary of the Interior has promulgated regulations that federal agencies are to follow to preserve "collections of prehistoric and historic material remains ... recovered under the authority of ... [ARPA]...." 36 CFR § 79.1(a). These regulations apply to "collections," which include "material remains that are excavated or removed during a survey, excavation or other study of a prehistoric or historic resource...." 36 CFR § 79.4(a). Under the regulations, the responsible agency official is required to place archaeological resources removed

---

71. That does not mean that Plaintiffs would have no right to study if the remains were properly determined to be "Native American" for purposes of NAGPRA, but cultural affiliation could not be established. NAGPRA and its implementing regulations are silent on this point, and a reasonable argument could be made that ARPA is applicable under these circumstances. However, that is an issue that need not be addressed, given the court's conclusion that the Secretary erred in finding that the remains are "Native American."

from federal land in a repository that (1) has adequate long-term curational capabilities, 36 CFR § 79.5; (2) uses "professional museum and archival practices," 36 CFR § 79.9(a); and (3) will make the collection available "for scientific, educational and religious uses," including scientific analysis and scholarly research by qualified professionals. 36 CFR §§ 79.10(a), (b).

ARPA permit requirements are binding on the Corps under regulations adopted by the Secretary of Defense. 32 CFR Pt. 229. These regulations provide for issuance of permits when particular requirements are satisfied. *See,* 32 CFR § 229.8(a). These requirements include a determination that the activity authorized "is to be undertaken for the purpose of furthering archaeological knowledge in the public interest which may include ... scientific or scholarly research, and preservation of archaeological data...." 32 CFR § 229.8(2) Accordingly, issuance of a permit providing for the collection of the remains of the Kennewick Man, was at least an implicit determination that doing so might further archaeological knowledge in the public interest.[72]

Given that they were collected pursuant to a permit issued under ARPA and are of obvious archaeological significance, it appears that, but for the assumption that they were subject to NAGPRA, the remains of the Kennewick Man would have been placed in a repository with "adequate long-term curational capabilities" that would have made them available to qualified professionals for scientific study. Plaintiffs are clearly the kind of "qualified professionals" referenced in the regulations.[73] The record establishes that Plaintiffs are eminent scientists in the field of "First American Studies" who have written hundreds of scientific articles, papers, and monographs, and have examined thousands of human skeletal remains. The record also establishes that, but for Defendants' assumption that NAGPRA applies, Plaintiffs almost certainly would have been allowed access to study the remains. In an earlier Opinion, I noted my conclusion that, but for Defendants' intervention, Plaintiff Owsley would have been allowed to study the remains, and that it was "highly probable that some or all of the other Plaintiffs also would have been allowed to conduct ... studies." *Bonnichsen,* 969 F.Supp. at 635. That conclusion was based upon evidence that study requests like those made by Plaintiffs are routinely granted. *Id.*[74]

72. The ARPA permit issued to Dr. Chatters explicitly required that copies of "all published journal articles ... and other published or unpublished reports and manuscripts resulting from work conducted under this permit" be filed with the Corps.

73. For example, an internal Corps e-mail identifies Brace as "a GIANT in the physical anthropology world. He literally writes the books on the subject." COE 7927.

74. In earlier proceedings in this action, Defendants argued that Plaintiffs had no right to study because the ARPA permit was issued to Dr. Chatters, not to Plaintiffs, because no agency decision to place the remains in a "collection" had been made, and because there is no absolute obligation to allow study by any particular scientists. These arguments are not well founded. The record supports only the conclusion that scientists are routinely allowed to study material actually obtained pursuant to permits issued to others, that permission to study does not depend on having been named in a permit to excavate or remove, and that study is generally carried out without issuance of a formal study permit. Under the regulations, it appears that an object does not become part of a "collection" because it is so designated by an agency, but because it is excavated or removed under the authority of ARPA. *See,* 36 CFR § 79.3(a). Though there is not an absolute obligation to allow particular scientists access to study, there is ample reason to believe that Plaintiffs would have been allowed to study under normal circumstances.

Nothing that has subsequently transpired in this litigation and nothing I have found in a careful examination of the administrative record undermines my earlier conclusion that, in the normal course of events, Plaintiffs would have been allowed to study the remains. Allowing study is fully consistent with applicable statutes and regulations, which are clearly intended to make archeological information available to the public through scientific research. Allowing study is also consistent with the usual practice of federal agencies under circumstances in which NAGPRA does not apply. Accordingly, I will order that Plaintiffs' request for access to study be granted, subject to the type of reasonable terms and conditions that normally apply to studies of archaeological resources under ARPA.

In reviewing the record, it appears that some of the studies that Plaintiffs intended to carry out have been done as part of the cultural affiliation analysis. The request to study is not moot, however, because Plaintiffs have pointed out that some further study may yield additional information and serve as a check on the validity of earlier results. I therefore will require Plaintiffs to submit a proposed study protocol to the agency within 45 days of the entry of this Order. Defendants shall respond to that proposed protocol within 45 days of its receipt. Defendants' response shall allow for study, subject only to the normal terms and conditions routinely imposed when studies of objects subject to ARPA are carried out.

## CONCLUSION

For the reasons set out above, Plaintiffs' motion for an order vacating Defendants' decision on remand (# 416–1) is GRANTED. Plaintiffs shall submit a proposed study protocol to the agency within 45 days of the entry of this Order, and Defendants shall respond to that proposed protocol within 45 days of the receipt of the proposed protocol. The parties joint memorandum of agreement concerning curation (# 170) shall remain in effect pending development of a study protocol.

Plaintiffs' request for relief based upon alleged violations of other statutes (# 416–2) is GRANTED in part and DENIED in part. Plaintiffs' request for a declaration that Defendants had violated NHPA is GRANTED, and the Plaintiffs' request for other relief is DENIED.